UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

|  |  |  |
|---|---|---|
| Brett A. Currier and | : | |
| Brenda L. Currier | : | Civil Action No. 18-CV-01204-LM |
| v. | : | |
| | : | |
| Town of Gilmanton | : | |
| and | : | |
| Marshall E. Bishop, Individually and | : | |
| d/b/a Gilmanton Winery and Vineyard | : | |

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

This case is the product of local politics, bruised egos, and unchecked acrimony. Plaintiffs are a former Select Board member and his wife. In the spring of 2016, Brett Currier and his ally Don Guarino were defeated in their runs for re-election by the admittedly brash Steve McWhinnie and local restaurateur (and relative newcomer to town) Marshall Bishop. Unhappy with this result, Plaintiffs and their allies took to attending virtually every Board meeting and challenging the new Board by criticizing its actions, questioning the integrity of its members, and generally dominating public comments at the meetings. Brenda Currier flooded the Town with public records requests, with particular interest in the process by which Bishop and his wife obtained state and local permits to operate their business, the Gilmanton Winery and Vineyard.

Unsatisfied with making public statements at Board meetings, Plaintiffs brought their accusations to the local newspaper. A series of articles and letters to the editor by numerous persons on each side of the political dispute followed. Plaintiffs then became embroiled in a

dispute over police funding and the Board's efforts to exert control over the Police Department – headed by none other than Plaintiffs' son, who was (and remains) the Chief of Police.

Rather than resolve their grievances through private dialog or the ballot box, Plaintiffs filed a 60-page, 291 paragraph Complaint (later replaced by an Amended Complaint that came in at a svelte 51 pages and 285 paragraphs), detailing their every perceived grievance and slight. The Amended Complaint – the operative pleading in this case – includes four counts: a sprawling defamation claim; an RSA 91-A claim; a First Amendment Retaliation claim; and a putative state constitutional claim.

Defendants now move for summary judgment on all claims.

## STATEMENT OF UNDISPUTED FACTS

### *Background*

The Town of Gilmanton is a small rural town of less than 4,000 residents. Declaration of Marshall E. Bishop ¶ 3, hereto as <u>Exhibit</u> <u>A</u>. It is run by a three-person Board of Selectmen, with each position lasting for three years barring an interim death or resignation. *Id*. ¶ 4. Town elections are generally held in March. *Id*. ¶ 4.

Brenda and Brett Currier are long-time Gilmanton residents. Indeed, Brenda prides herself on being a fifth-generation resident. *See* Deposition Transcript of Brenda Currier ("Brenda Dep.") at 72:17-23, relevant portions of which are attached hereto at <u>Exhibit</u> <u>B</u>; Deposition Transcript of Brett Currier ("Brett Dep.") at 9:12-14, relevant portions of which are attached hereto at <u>Exhibit</u> <u>C</u>. Both have also been active on various Town boards and committees or otherwise engaged in community life. Brenda worked at the Police Department, Fire Department, and the school, while Brett served on the Budget Committee and as a volunteer fire fighter. Brenda Dep. at 18:21 to 21:19; Brett Dep. at 12:16-24. Their son, Matt, was employed as a police officer and presently serves as the Chief of Police. Brett Dep. at 40:22-25.

In 2012, Brett was elected to a three-year term on the Board of Selectmen.  Brett Dep. at 14:03-04.  The primary focus of his campaign was keeping taxes down, although he also had issues with the way the Planning Board was being run, as he felt it interfered with people doing what they wanted with their property.  *Id*. at 14:03-09, 18:10 to 19:02.  The following year, in 2013, Don Guarino was elected.  *Id*. at 15:17-23.  Brett supported Guarino's candidacy because he agreed with Guarino's politics.  *Id*. at 16:03-06.  Together they formed a voting majority on the three-person Board.

The Board made changes to Town operations after the 2013 election.  For starters, it hired Guarino's sister-in-law, Stephanie Fogg, to fill a part-time administrative position.  *Id*. at 26:07 to 27:12.  At Brett's recommendation, it brought in a new maintenance person, Glen Lines, to undertake minor repairs of Town buildings.  *Id*. at 28:15 to 32:03.  It also changed the composition of the Planning Board, electing not to reappoint longtime Chairperson Nancy Girard.[1]  *Id*. at 19:03 to 21:07.

The 2013 Board also adopted a policy entitled "Public Participation at Board Meeting."  *See* Brett Dep. at 34:03 to 36:03 and Ex. 3 thereto.  The policy provides that the Board allow public input at the start of each meeting not to exceed 5 minutes per person and 30 minutes in total.  *Id*. at Ex. 3.  The Board retained authority to terminate remarks that did not adhere to the rules.  *Id*.  Brett agrees that the Board has discretion to control its own meetings in this manner.  Brett Dep. at 36:08-20.

In 2014 Steven McCormack was elected to the Board, joining Currier and Guarino.  Brett Dep. at 37:24 to 38:11.  In 2015, Michael Jean replaced Brett on the Board.  *Id*. at 40:13 to

---

[1] Another Planning Board member, John Funk, also left at this time.  Currier could not recall if the Board decided not to reappoint Funk or if Funk resigned, but Currier admitted he did not like the decisions of Girard and Funk as Planning Board members and he felt "zero" love lost when they left.  Brett Dep. at 19:03 to 21:07.

47:08.  That summer, then Police Chief Joseph Collins informed the Board that he would be retiring.  *Id*. at 41:04 to 42:03.  The Curriers also learned of the retirement from their son, who they believed should automatically be named the new Chief.  *Id*. at 41:06 to 44:13.  McCormack, however, met the Curriers at their camp in Stewardstown and informed them that the Board was going to conduct an open search to fill the position instead.  *Id*. at 41:20 to 43:16.  Brenda felt that McCormack was seeking their blessing for this approach.  Brett Dep. at 44:05-10.  Both Curriers were angry over the revelation, ostensibly because this was private Board information that McCormack should not have shared.  *Id*. at 42:04 to 43:19.  Brett admitted that he was primarily angry because the news would upset his wife and ruin his weekend.  *Id*. at 42:05 to 45:21.

Even though they had already known – from their son – that the Chief was retiring, the Curriers expressed outrage by the leak.  *See id*. at 43:11 to 43:23.  Ultimately, McCormack resigned from the Board, at which time Brett volunteered to fill his term – an appointment which needed to be made by agreement of the two remaining Board members.  *Id*. at 43:30 to 43:22.  Guarino supported Currier's appointment, but Jean did not.  Brett Dep. at 46:20-24.  A former Board member, Rachel Hatch, was eventually appointed to fill the seat until the 2016 election.  *Id*. at 46:25 to 47:02.  Plaintiffs' son, Matt Currier, was appointed Chief of Police in November 2015.

### 2016 Board Election and Aftermath

Due the McCormack resignation, there would be two open seats in the 2016 election – a three-year seat held by Guarino and the remaining one-year term that had been McCormack's and was being vacated by Hatch.  Brett chose to run for the one-year seat, while Guarino stood for reelection for the three-year term.  Brett Dep. at 52:25.  Brett and Guarino supported each

other in the campaign. *Id*. Guarino lost to long-time resident Steve McWhinnie by a margin of just seven votes (eight on recount). Bishop Decl. ¶ 6. Marshall Bishop defeated Brett by a larger margin of 77 votes. Bishop Decl. ¶ 5.

One of the first topics addressed by the newly comprised Board (Jean, McWhinnie and Bishop) was Fogg's position and particularly her role in taking Board minutes. Bishop Decl. ¶ 8. The new Board decided to move the minute taking functions from Fogg to Heather Carpenter, who had substituted for Fogg in that capacity when Fogg was out sick. *Id*. Shortly after, the Board voted to return Fogg's position to part time – which just six months earlier had been elevated to full-time with benefits by the prior Board (on which her brother-in-law, Guarino, sat). *Id*. ¶ 9.[2] The Board terminated the Town's relationship with Glenn Lines, the maintenance person earlier hired at Brett's recommendation, because he lacked liability insurance, and it put the Town's electrical work out to bid. *Id*. ¶ 10. The electrical work went to a new contractor after the prior one (Wayne Ogni) did not submit a bid. *Id*.

Seemingly oblivious to the irony, the Curriers, Guarino, and Guarino's wife, Sandy, expressed outrage over the changes to the personnel that Brett and Guarino installed in Town employment during their tenure on the Board. They became active in opposing the new Board's agenda, appearing at Board meetings to challenge the Board's decisions, often dominating the meetings. At the Board meeting of April 25, 2016, for example, Brenda confronted the Board with a four-page letter she read aloud, including some 32 different questions she posed to various board members or the Town Administrator, Paul Branscombe. Bishop Decl. ¶ 12. During the

---

[2]     Don Guarino is Fogg's brother-in-law. Bishop Decl. ¶ 9. The prior Board (on which Guarino sat) had elevated Fogg's position to full time with benefits only six months earlier. Fogg went out on leave rather than return to part-time and later resigned. *Id*. ¶ 9. Fogg then brought an employment action against the Town asserting that she had been retaliated against for whistleblowing and constructively terminated. *Id*. The case was settled with no admission of fault. *Id*.

public comment portion of the meeting, Brett Currier opened the session by criticizing the Town Administrator over Fogg's reduction of hours and loss of benefits, joined thereafter by Brenda and the Guarinos.  *Id*. ¶ 12.  A week later (May 2, 2016) the Curriers and Guarinos again appeared and commented in the public comment portion of the meeting.  *Id*. ¶ 13.  Brenda again used the time to read a lengthy statement into the public record.  *Id*.  On May 16, 2016, Brenda presented a further list of questions to the Board.  *Id*.

The Curriers did not content themselves with attacking the Board's action at public meetings.  Brenda spoke with and emailed Laconia Daily Sun journalist Gail Ober numerous times, sending the writer her thoughts on the current Board for inclusion in the newspaper. Brenda Dep. at 31:01-24.  On June 30, 2016, for example, she wrote Ober that "[f]or months now I have been questioning the ethics and legality of this Board of Selectmen," and forwarded Ober a summary of her accusations against the Board.  Brenda Dep. 35:24 to 37:22 and Ex. 3 thereto.  She urged Ober to conceal her role, however, asking the journalist to "leave my name out of the article if you write one."  *Id*.

Brett was also vocal in the press, writing a letter to the editor on June 13, 2016, in which he accused the Board of having "calculated vendettas" and "playing politics" rather than conducting "real town business."  Brett Dep. at 66:1 to 66:2 and Ex. 5 thereto.  That spring, Brett also paid a visit to Bishop at the winery Bishop co-owned with his wife.  *Id*. at 62:13 to 64:14. Brett passes the visit off as just giving Bishop "advice" – advice he concedes included pointing out that unlike McWhinnie, Bishop had "a lot to lose."  *Id*. at 63:06-14.  Bishop perceived Brett's visit and statement as a direct threat to his home and the Winery.  Bishop Decl. ¶ 19.  Bishop recalls that Brenda also stated that she would take his livelihood away, just as she claimed he had done to Fogg.  Bishop Decl. ¶ 18. Brenda denies this comment. Brenda Dep. at 105:14 to 106:04.

*Winery Dispute*

In the weeks and months that followed Brett's visit to the Winery, the Curriers made every effort to realize their threat of stripping Bishop of his livelihood.  As noted already, Bishop and his wife owned The Gilmanton Winery and Vineyard.  Bishop Decl. ¶ 14.[3]  Over several years, beginning in 2010, the Bishops expanded the Winery functions, adding tastings, function rooms and eventually a restaurant.  Bishop Decl. ¶ 15.  The Curriers themselves had dined there once and never previously expressed any concerns over its permitting, even when Brett was on the Board.  Brett Dep. at 40:13-19; Brenda Dep. at 103:10 to 104:15.

All that changed after the 2016 election.  Brenda began by insisting that Bishop remove a Winery sign from property she owed, occupied by her mother, where it had stood for years without protest.  Bishop  Decl. ¶ 17.  She later contested its relocation, challenging whether it was properly permitted.  *Id*.  On June 2, 2016, Brenda sought documents from the Liquor Commissioner about licensing and certifications for the Winery.  *See* Declaration of Counsel, attached hereto as Exhibit D, at Ex. 1.  On June 9, 2016, Brenda attended a Planning Board meeting and read a one-page letter questioning the legality of the Winery.  Counsel Decl. at Ex. 16.  Around the same time, Brenda requested documents from the Town under RSA 91-A concerning the Winery's permitting, which she followed up a week later insisting that the Code Enforcement Officer remove "any/all signs that are not in compliance with the Zoning Ordinances" and insisting that that the Winery signs be removed by the following day.  Counsel Decl. Ex. 2.  In the meantime, Brett – a septic installer by trade – opened a second front on the assault on the Winery, contacting the Department of Environmental Services ("DES") to

---

[3]     As it happens, the Winery operates in the former home of Grace Metalious, the author of *Peyton Place*, which itself is a novel about living in a small, gossipy conservative town based on real events in Gilmanton in the 1930s and 1940s.  Bishop Decl. ¶ 14.

challenge the permitted use of the Winery's septic system.  Brett Dep. at 86:19 to 90:25.  Not to be outdone, Brenda then sent a letter to the Board claiming that the Winery was a potential health risk and stating that its septic system "cannot support the 40-seat restaurant" and other functions. Counsel Decl. at Ex. 3.

Against this backdrop, on June 21, 2016, Town Administrator Paul Branscombe wrote to the County Attorney asking for review of the situation, noting that a selectman "is being harassed by a Resident . . . the wife of the chap who lost in the running last March."  Affidavit of Counsel, Ex. 4.  After the County Attorney declined, Bishop wrote to the Attorney General – with editorial review by Branscombe – asking the that the AG review the threats against him and what he perceived to be the Curriers' misuse of RSA 91-A.  Bishop Decl. ¶ 30 and Ex. 2 thereto. Bishop asked that the AG advise if there was anything he or the state could do to end the threats and harassment.  *Id.*  Bishop also wrote a private letter to the DES explaining the Winery's operation and capacity.  *Id*. ¶ 26 and Ex. 3 thereto.  He also provided his view on what prompted the complaint in the first place.  *Id*.  Bishop later submitted a revised version of this document to the Laconia Daily Sun, where it was published as an "open letter" to DES.  *Id*. ¶ 27 and Ex. 3 thereto**.**

Undaunted, Brenda attended the July 11, 2016, Board meeting and asked the Board to issue a cease-and-desist order to close the Winery.  Bishop Decl. ¶ 21.  She also submitted a 91-A request for all Town communications with any state agency regarding the Winery.  Decl. of Counsel Ex. 5.  On August 12, 2016, she again contacted the Liquor Commission, stating that she believed the information the Town had provided to the Commission regarding the Winery permitting was incorrect. Counsel Decl., Ex. 6.  That same day, she contacted Planning Board Chair Wayne Ogni (the electrician replaced by the new Board four months earlier) and expressed

her belief that the Winery had not been properly permitted.   Counsel Decl. Ex. 7.

Like their grievance over the Board's employment practices, the Curriers' challenge to the Winery poured over into public view as the Laconia Daily Sun saw fit to publish numerous articles on the Winery and the disputes surrounding it and then a series of letters written by various parties in response to the articles.   Name calling abounded, with Bishop stating that the Board was "inundated by constant remarks and threats" from the Curriers and others.   Bishop Decl. at Ex. 5.   Brenda wrote her own letters, claiming she refused to "sit by and have Mr. Bishop fabricate details and attempt to rewrite history when I think he is telling another whopper." Counsel Decl. Ex. 8.   Like Bishop, Brenda also wrote to the Attorney General, setting out her version of the controversy with Bishop.   Counsel Decl. Ex. 9.

Ultimately, the Planning Board issued a cease-and-desist order that would have closed the Winery over Thanksgiving.   Bishop Decl. ¶ 24.   The Bishops sued the Town over the decision and won an injunction to prevent the closure.   *Id*. ¶ 24.   The Town ultimately settled the case and the Winery dispute appeared over.   *Id*. ¶ 24.

### *"Support the Police" Sign Dispute*

In March 2017 Bishop was reelected to the Board, this time to a full three-year term, defeating Guarino by 182 votes.   Bishop Decl. ¶ 31.   In December of that year, the Board (still Jean, McWhinnie and Bishop) issued a directive requiring the Chief of Police (the Curriers' son, Matt) to provide the Board information on hiring and schedules and proposed a budget that would move funds from the police department to legal expenses.   Bishop Decl. ¶ 32.   The Curriers objected to both the directive and the proposed cut to their son's budget.   *Id*. ¶ 33.   In early 2018 they and others posted signs proclaiming: "We Support the Police even if the Selectmen Don't."   Bishop Decl. ¶ 33.

At that time Gilmanton Zoning Ordinance Article III-F-8 required permits for signs and further provided: "only signs advertising a business or industry in the Town of Gilmanton shall be permitted." Counsel Decl., Ex. 10. On January 31, 2018, Heather Carpenter (then Assistant Town Administrator), received a complaint from a resident about the signs, which appeared to violate the ordinances. Declaration of Heather Carpenter ("Carpenter Decl.") ¶ 3, attached hereto as Exhibit E. The resident was reluctant to file a formal complaint, understandably stating that he was afraid of incurring the wrath of Brenda Currier. Carpenter Decl. ¶ 4. As such, Carpenter (a Town resident herself) confirmed the presence of the signs, after which she submitted a complaint in her own name to Code Enforcement. Id. ¶ 5. On February 12, 2018, Carpenter submitted a second complaint, also on behalf of a resident. Carpenter Decl. ¶ 6.

On February 14, 2019, the Code Enforcement Officer sent letters to several people with the "support the police" signs, including the Curriers and Guarinos, stating that the signs violated Town zoning and signage rules and did not fit within the exception for political signs provided by RSA 664. Brenda Dep. 64:09-22 and Ex. 6 thereto. The letter demanded that the signs be removed by February 22, 2018, or face fines of $275 per day. Id. at Ex. 6. The letter also advised that the recipient could appeal the decision to the ZBA and provided the location of instructions for filing such an appeal. Id.

Rather than file an appeal to the ZBA, the Curriers contacted the ACLU about the cease-and-desist letters. Brenda Dep. at 64:25 to 65:18. On February 26, 2018, the ACLU sent the Town a two-page letter advising that – in its view – the letters violated state and federal law and requested that the letters be retracted immediately. Id.; Ex. 7 to Brenda Dep. On March 9, 2018, the Town did just that. Brenda Dep. 69:12-21 and Ex. 8 thereto. The Curriers were never fined, nor did they remove their sign, although they did take it down one night to adjust the language to

conform to the political sign definition.  Brenda Dep. 69:12-21 and 66:02-13.  They reposted it the very next morning.  Brett Dep. 75:02-24.

*91-A Requests and Closure of Town Hall*

The police dispute did not end there.  On February 2, 2018, Brenda went to the Town Hall and requested a copy of the sign complaint.  Carpenter Decl. ¶ 6.  She met with Carpenter, who provided the document.  *Id*.  Carpenter told Brenda that she – Carpenter – did not want to see herself being slandered on Facebook.  *Id*.  Brenda instantly submitted a formal complaint, claiming that Carpenter had used "threatening words and tone of voice" during their interaction. *Id*.

Brenda also began filing 91-A requests about the sign complaint and other actions by the Board.  These included 91-A requests filed on February 21 and 22, 2018.[4]  *Id*. ¶ 8.  On February 21, Brenda again spoke with Carpenter, this time about a second sign complaint signed by the Assistant Town Administrator.  Each woman described the encounter somewhat differently, but it was lengthy and heated.  Brenda Currier then filed another complaint about Carpenter.  Decl. of Counsel, Ex. 11.

Carpenter felt that Brenda had been invading her space.  Carpenter Decl. ¶ 11.  On February 23, 2018, Carpenter complained to the Board that the situation at Town Hall was making her feel unsafe.  *Id*.  The Board held an emergency meeting and closed the Town Hall for the remainder of the day.  Bishop Decl. ¶ 35. That evening, the Board held an emergency meeting and decided to renovate the building so that there would be a physical barrier between

---

[4]     Brenda Currier was not alone filing record requests with the Town during this period. She was joined in the effort by others, and it appeared to Town staff that it was a coordinated effort to overwhelm the Town with document requests.  Carpenter Decl. ¶ 10-12.

staff and members of the public.[5]  *Id*.  In the meantime, the front door of the Town Hall was to remain locked, and visitors were required to use the back entrance and a buzzer system to access the building.  *Id*.  The Town then posted the closure online, citing "safety concerns."[6]  *Id*.

On March 7, 2018, the Board issued a press release about the closure of the Town Hall. Decl. of Counsel Ex. 12.  In it, the Board stated in part that, on February 23, Town employees received "an overwhelming number of requests for information" and that the requests were stopping them from completing their regular duties.  *Id*.  The release also mentioned that the conduct of some of the individuals who came to the Town Hall that day also made staff feel unsafe.  *Id*.

### Ballot Clerk

Brenda Currier has served "for eons" as a town Ballot Clerk in local and national elections.  Brenda Dep. at 19:12-24.  She did not serve as a Ballot Clerk for the election on March 13, 2018, however, because the Town already had enough volunteers staffing it.  Decl. of Counsel at Ex. 13.  Brenda Currier returned as a Ballot Clerk the following year, in 2019. Brenda Dep. at 19:22-24.

Bishop was not involved in the selection or scheduling of ballot clerks and had no influence on the decision to select (or not) Ms. Currier.  Bishop Decl. ¶ 36.  At all relevant times, Bishop believed based on the Curriers' actions, including not only their direct statements to him but also their challenge to the Winery permitting, their reports to multiple state agencies, and

---

[5]     Interestingly, Chief Currier had been advocating for this exact step for years.  Brett Dep. 70:17 to 71:20 and Ex. 6 thereto.  Prior to Brett Currier's election, the Town Hall was closed every Tuesday.  *Id*. at 23:05-06.

[6]     At least one resident – a supporter of the Curriers – contacted Brenda Currier to find out why the Town Hall had closed, recognizing her as the leader of the opposition to the Board. Brenda Dep. at 70:06-21.

their media campaign, that they were indeed harassing him and attempting to ruin his business, which was his livelihood. *Id*. ¶ 37. He likewise believed based on reports from Carpenter that she had felt the situation at the Town Hall was unsafe. *Id*. ¶38.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment motions provide courts the opportunity to "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Acosta v. Ames Dept. Stores, Inc*., 386 F.3d 5, 7 (1st Cir. 2004) (quoting *Wynne v. Tufts Univ. Sch. of Med*., 976 F.2d 791, 794 (1st Cir. 1992)). Thus, while the initial burden is upon the moving party to establish the lack of a genuine, material, factual issue, *Finn v. Consolidated Rail Corp*., 782 F.2d 13, 15 (1st Cir. 1986), and the court must view the record in the light most favorable to the non-movant, *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir. 1988), if a motion for summary judgment is properly supported, the burden shifts to the non-movant to show that a genuine issue exists. *Donovan v. Agnew*, 712 F.2d 1509, 1516 (1st Cir. 1983).

## ARGUMENT

Plaintiffs allege four broad claims against the Town and Bishop: Count I for defamation (both Defendants); Count II for violation of RSA 91-A (Town only); Count III for First Amendment violations under § 1983 (both Defendants); and Count IV for violation of the New Hampshire Constitution Part 1, Article 22 (both Defendants). As explained in this Memorandum, Defendants are entitled to summary judgment on all counts.

13

## I.   DEFEENDANTS ARE ENTITLED TO SUMAMARY JUDGMENT ON PLAINTIFF'S COUNT I FOR DEFAMATION

Plaintiffs assert that they have been defamed by Bishop and various Town employees, both named and unnamed.  The allegations of defamation are sprawling, with Plaintiffs citing no less than twenty-six (26) instances of alleged defamation in the Amended Complaint (paragraphs 244 to 246), and another eighteen (18) alleged instances in their interrogatory answers.[7] Although some of the alleged defamation appears in writings, most are vague, second-hand accounts of things supposedly overheard in conversations of Bishop with others.

The Town is entitled to summary judgment on Count I of the Amended Complaint because defamation claims against municipalities are barred under RSA 507-B.  Plaintiffs' defamation claims against Bishop fair no better.  As limited public figures, Plaintiffs cannot establish the requisite showing that any of the alleged defamatory statements they attribute to Bishop were actuated by malice.  Plaintiffs' defamation claims also fail because the accused statements are absolutely privileged, protected under RSA 507-B as made within the scope of Bishop's office and in good faith, constitute nonactionable opinion, lack defamatory meaning, are truthful, or lack for evidence.

### A.   Plaintiffs' defamation claims against the Town are barred by RSA 507-B.

As a New Hampshire municipality, the Town cannot be held liable for defamation as a matter of law.  Revised Statutes Annotated chapter 507-B:5 (1997 & Supp. 2006) provides that "[n]o governmental unit shall be held liable in any action to recover for bodily injury, personal injury or property damage except as provided by this chapter or as is provided or may be provided by other statute." *Accord Farm Family Casualty Ins. Co. v. Rollinsford*, 155 N.H. 669,

---

[7]      Exhibit 14 to Counsel's Declaration is a composite of Plaintiff's defamation allegations in the Amended Complaint and Exhibit 15 is Brenda Currier's answer to Interrogatory 7, which describes yet more instances of alleged defamation.

670-71 (2007); *Holm v. Derry, et al.*, Civ. No. 11-cv-32-JD, slip. op. at 5-9 (D.N.H. Dec. 20, 2011, DeClerico, J.).  The term "personal injury" is expressly defined by the statute to include "libel, slander, or the publication or utterance of other defamatory or disparaging material." RSA 507-B:1, III(a).

Neither RSA 507-B nor any other New Hampshire statute provides for a cause of action against a municipality for defamation.  As such, under RSA 507-B:4, the Town cannot be found liable for defamation, and Count I must be dismissed.

**B.      As limited purpose public figures, Plaintiffs lack clear and convincing evidence of false statements made with actual malice.**

Plaintiffs knowingly and intentionally injected themselves into the public forum when they mounted their campaign to attack the Board and Bishop's Winery.  By doing so, Plaintiffs made themselves limited purpose public figures on all the issues that underpin their defamation claims.  Defendants are entitled to summary judgment because Plaintiffs are incapable of establishing clear and convincing evidence that any of the alleged defamatory statements were made by Defendants with actual malice.

Under the First Amendment, private citizens who "thrust[s] themselves to the forefront of [a] particular public controvers[y]" becomes a limited public figure for purposes of claims arising from such controversies.  *Thomas*, 155 N.H. at 341 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974)).  Once a person voluntarily enters the public forum, he or she forfeits the full protections of state defamation law.  Instead, a limited purpose public figure plaintiff must prove that the defendant acted with actual malice by clear and convincing evidence. *Thomas*, 155 N.H. at 340.  The term "actual malice" in this context does not speak to the motivation of the alleged defamer.  Rather, it requires a plaintiff demonstrate that the defendant either knew the statement to be false or acted with reckless disregard to its falsity.  *Pendleton*,

156 F.3d at 65.

The conduct that will thrust a plaintiff into limited public figure status need not be significant.  In *Pendleton v. City of Haverhill*, the First Circuit found the plaintiff to be a limited purpose public figure because of plaintiff's grant of a single interview for a profile article.  156 F.3d 57, 69 (1st Cir. 1998).  In *Bourne v. Arruda*, this Court assigned limited purpose public figure status to a plaintiff who published a letter in the local newspaper on the issues underlying the defamation claim.  2013 DNH 003, *4-6 (D.N.H. Jan. 8, 2013).

Plaintiffs' public forum conduct in this case far surpasses that of the plaintiffs in *Pendleton* and *Bourne.*  Beginning in April 2016 and throughout the relevant period of this dispute, Plaintiffs appeared at countless public meetings to challenge the Board and its decisions and to question the licensing and public safety of the Winery.  Plaintiffs reported the Winery to local and state regulators claiming it was unlicensed and unsafe.  Plaintiffs solicited news articles and submitted letters to the editor of the local newspaper for publication raising the same complaints and issues.  Indeed, Brenda Currier was so closely identified with the controversies swirling in town about the Board and Bishop's Winery that other residents contacted her to find out why the Town Hall closed in 2018.

For their part, Defendants responded in the public forum precisely because of the publicity and public attention Plaintiffs had gained by accusing the new Board of pursuing political vendettas and wrongfully terminating employees, accusing Bishop of running his business illegally, and amplifying their claims through the media.  All the statements Plaintiffs accuse as defamatory were within the scope of the public controversy into which Plaintiffs asserted themselves or, more precisely, that Plaintiffs themselves had spawned.

Yet, as limited purpose public figures, Plaintiffs have no evidence beyond their own

subjective opinions that any of the alleged defamatory statements were known to be false by the speaker when made or made with reckless disregard of the truth.  For example, Plaintiffs cannot prove as objectively and knowingly false any of Marshall Bishop's assertions that:

(i)     Plaintiffs "tried in every way to disrupt the Board of Selectmen meetings and constantly using the 'right to know law' for other than the reason it was intended" (Ex. 3 to Bishop Decl.);

(ii)    "I believe Mr. Currier is not doing this because of a concern for the environment" (*Id*.);

(iii)   "I apologize for the inconvenience Mr. Currier has caused [DES].  I am ashamed to admit that he was a former selectman.  His actions are not professional, but rather a bully mentality.  He liked to be the center of attraction [sic]." (*Id*.);

(iv)    "Since the first week of the election of new Selectmen in March of this year the incoming board has been inundated by constant remarks and threats against us by a small group of people, primarily, from former selectmen Currier, Don Guarino and their wives, along with commentaries from Al Blake" (Ex. 5 to Bishop Decl.);

(v)     "I never expected former selectmen's wives calling us 'despicable', liars, thieves, and everything in-between at a town meeting" (*Id*.);

Although these statements are nonactionable for a host of other reasons (lack of defamatory meaning, opinion, truth), they unquestionably fail under the heightened standard of clear and convincing evidence showing actual malice applicable to limited purpose public figures.  The same holds true for the defamatory statements Plaintiffs allege against other Town employees:  none are capable of being proven as having been made with actual malice.  *See, e.g.,* Amended Compl. ¶¶ 29, 70-72 (alleging Town Administrator said Plaintiffs' comments at a public meeting were "nonsense," that Plaintiffs were on a "witch hunt," and, in reference to a different public meeting, that Plaintiffs were "out of hand").

Defendants are entitled to summary judgment on Count I because it fails under the actual malice standard that governs Plaintiffs' defamation claims as limited purpose public figures.

## C.   Plaintiffs cannot show statements Bishop made within the scope of his Town office lacked good faith.

Under RSA 507-B, statements of Town officials made within the scope of their office and in good faith are not actionable for defamation.  RSA 507-B:4, IV.  Although "good faith" is not defined by the statute and the New Hampshire Supreme Court has yet to address its meaning in a published opinion, courts have applied RSA 507-B to bar claims where a plaintiff is unable to muster anything more than conclusory statements of wanton conduct.[8]   *See, e.g., Day v. Hurley*, 2014 DNH 099 (D.N.H. May 6, 2014) (applying RSA 507-B to bar intentional tort claims supported by conclusory assertions of wanton conduct).

Here, Plaintiffs accuse Bishop of defamation for statements that are impossible to separate from his scope of office as a Board member and for which Plaintiffs have no evidence of wanton conduct.  The alleged defamatory statements attributed to Bishop barred by RSA 507-B:4, IV include those published in the Laconia Daily Sun describing Plaintiffs' conduct at town meetings as disruptive, threatening, and undermining the Board and its work.  Amend. Compl. ¶¶ 70-72, 78, 81, 85, 100.  It also includes statements Bishop allegedly made about the Board's decision to temporarily close the Town Hall in February 2018 and Brenda Currier's role in prompting the closure.  *Id.* ¶¶ 192-94, 198-99, 215-16, 231-35.  The indisputable evidence is that the Board acted to the close the Town Hall for an afternoon and restrict access thereafter in response to concerns express by Town staff arising from the flood of record request and near constant (and hostile) presence of Brenda Currier and others at the Town Hall.  Carpenter Decl. ¶¶ 8-15; Bishop Decl. ¶¶  34-35.

---

[8]      In an unpublished order, the New Hampshire Supreme Court concluded "that the legislature, in protecting municipal employees under RSA 507-B, IV, intended to except from the statute only bad faith' conduct rising to the level of intentional misconduct." *Charles J. Bowser, Jr., Special Administrator of the Estate of Kenneth Countie v. Town of Epping*, Case No. 2010-0868, at *3 (N.H. Sept. 16, 2011).  As an unpublished opinion, however, it has no precedential value under New Hampshire Supreme Court Rule.  Sup.Ct. R. 20(2).

**D.** **Absolute privilege protects Defendants' statements to prosecuting authorities**.

In New Hampshire, statements to prosecuting authorities are entitled to absolute privilege and cannot give rise to a claim for defamation. *McGranahan v. Dahar*, 119 N.H. 758, 769 (1979). This rule is intended to promote the "substantial interests of society in encouraging citizens to report suspected criminal activity to the appropriate legal authorities, and to cooperate fully in investigations." *Id*. at 768.

In this case, Plaintiffs are barred by this absolute privilege from pursuing defamation claims based on the statements the Town Administrator made to a County Attorney and Bishop made to the New Hampshire Attorney General. Amend. Compl. ¶¶ 244-B, 244-E; Exs. 1 and 2 to Bishop Decl. These statements qualify under the privilege because they were made to prosecuting authorities to determine whether Plaintiffs' disruptive conduct at town meetings, harassment of Bishop, and abuse of right-to-know requests amounted to criminal activity.

Accordingly, Defendants are entitled to summary judgment on Count I to the extent it relies on statements Defendants made to prosecuting authorities.

**E.** **Plaintiffs' defamation claims rest on nonactionable statements of opinion.**

A statement of opinion, no matter how defamatory, is not actionable unless it implies the existence of facts that can be proven true or false. *Gray v. St. Marten's Press, Inc*., 221 F.3d 243, 251-52 (1st Cir. 2000) (*citing Milkovich v. Lorain Journal Co*., 497 U.S. 1, 18-20 (1990)). "[T]he cases are likely to protect a statement as 'opinion' where it involves expressions of personal judgment, especially as the judgments become more vague and subjective in character…'[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable.'" *Gray*, 221 F. 3d at 248 (citations omitted). The purest

form of opinion "occurs when the make of the comment states the facts on which he basis his opinion of the plaintiff and then expresses a comment as to the plaintiff's conduct, qualifications or character." *Restatement (Second) of Torts* § 566 comment b. "Whether a given statement can be read as being or implying an actionable statement of fact is itself a question of law to be determined by the trial court in the first instance, considering the context of the publication as a whole." *Nash v. Keene Publ'g Corp*., 127 N.H. 214, 219 (1985).

Ambiguous and generic expressions, even if pejorative, unquestionably fall in the category of protected "opinion." *See, e.g., Steinhilber v. Alphonse*, 501 N.E.2d 550, 554 (N.Y. App. 1986) (identifying factors to consider in "differentiating between fact and opinion"). For example, the First Circuit has held that the term "unprofessional" is opinion because it has no "single, readily ascertainable meaning." *Piccone v. Bartels*, 785 F.3d 766, 772 (1st Cir. 2015) (quotations omitted). More generally, "[w]here an expressive phrase, through pejorative and unflattering, cannot be 'objectively verified,' it belongs squarely in the category of protected opinion." *Id*. Indeed, the New Hampshire Supreme Court has held that the expressions "journalistic smear" and "journalistic scum of the earth" amounted to "a vigorous epithet used by those who consider the plaintiff's journalism deplorable, and not an assertion of fact." *Pease v. Telegraph Publ'g Co., Inc*., 121 N.H. 62, 65 (1981) (quotations and citation omitted).

Ultimately, any statement viewed through a strained prism can be deemed to reveal a latent underlying fact. At the summary judgment stage, however, it is incumbent on Plaintiffs not to merely to rest on speculative interpretation, but to provide evidence that some listener perceived the statement as defamatory. *See Duschayne v. Monro Enter.*, 125 N.H. 244, 249 (1984).

In this case, Plaintiffs' defamation claims rest on a slew of allegations that amount to no

more than nonactionable statements of opinion.  Bishop declaring that he was ashamed that "[Brett Currier] was once a selectman," that Brett Currier's "actions are not professional but rather a bully mentality," that Brett Currier "liked to be the center of attraction [sic]," or that "I believe Mr. Currier is not doing this because of a concern for the environment" are obvious statements of opinion.  *See* Exs. 3 and 5 to Bishop Decl.  So too are Bishop's alleged statements to a visitor at Town Hall that "the Curriers are causing me problems" and "[t]he Curriers are used to being in power and now they are losing their power since [I] beat Brett by 77 votes."  Amend. Compl. ¶¶ 53-54.  Indeed, by Plaintiffs' own admission, Bishop went on to explain to the visitor that his Winery was properly permitted, which was the underlying factual dispute for which the Curriers were causing him "problems."  *Id.*

Bishop's statements about Plaintiffs' conduct at public meetings and misuse of the right-to-know law are also plainly statements of opinion.  *Id.* ¶¶ 78, 81.[9]  Even Plaintiffs' allegation that Bishop said the Curriers "made threats against his livelihood" is not actionable because it is too ambiguous to be understood as anything other than Bishop's subjective view.  *Id.* ¶¶ 30-32, 32.

### F.  Bishop is entitled to qualified privilege for his statements defending the Winery.

"[E]ven if a statement is false, a qualified privilege exists if it was 'published on a lawful occasion, in good faith, for a justifiable purpose, and with a belief, founded on reasonable grounds of its truth, provided that the statement is not made with actual malice."  *Collins v. UNH*, 664 F.3d 8, 19 (1st Cir. 2011) (quoting *Simpkins v. Snow*, 149 N.H. 735, 661 A.2d 772, 776 (1995)) (internal alterations omitted); *see also Moore v. Butler*, 48 N.H. 161, 166 (1896) ("A party cannot be held liable for a statement or publication tending to disparage private character,

---

[9]      Notably, Plaintiffs admit Brenda told the Board at a meeting that they were "'despicable,' liars thieves and everything in between."  Amend. Compl. ¶ 81.

if it is called for by exigencies of social duty, or is necessary or proper to enable him to protect his own interest . . . (and) is made in good faith and without willful design to defame.").

Bishop's statements about the Curriers appearing in his July 11, 2016, letter to DES (which was republished in revised form in the Laconia Daily sun as an "open letter" to DES) are conditionally privileged.  Exs. 3 and 4 to Bishop Decl.  Bishop published the letter on a lawful occasion and for a justifiable purpose because he was responding to DES on questions raised by the Curriers about the Winery's permitting and safety of operations. *See id.* Moreover, even if these statements were provably false, there is no evidence Bishop knew of the falsity at the time he made the statements or that he made the statements with actual malice.

### G.  A host of other problems plague Plaintiffs' defamation claims.

Plaintiff's defamation claims are riddled with other fatal defects as well.  For example, it is apparent that Plaintiffs are resting their defamation claims in part on statements Bishop submitted to a court in connection with his lawsuit against the Town.  These statements were later  reported by the Laconia Daily Sun, and it is those reports Plaintiffs assert to be defamatory. *See, e.g.,* Amend. Compl. ¶¶ 244-L, 244-M.  Bishop's statements to a court in litigation are absolutely privileged and he is not responsible for a newspaper's independent decision to report those statements.  *McGranahan v. Dahar*, 119 N.H. at 771.

Plaintiffs also rely in Count I on the vague notion that Bishop is somehow responsible for statements made by others – some anonymous and some not – that Plaintiffs deem defamatory. Amend. Compl. ¶¶ 244-I, 245-Q.  Because Plaintiffs have no evidence or viable legal theory to link Mr. Bishop to these alleged statements, they cannot support Plaintiffs' Count I.

There is also the matter of truth.  Plaintiffs assert that Bishop defamed them by telling others that Plaintiffs "put him through so much and cost [him] $30,000."  At best, this is a mixed

statement of opinion and verifiable fact:  Bishop spent $30,000 in legal fees to stop the Town from closing the Winery after Plaintiffs complained unrelentingly to state agencies and the Town Planning Board that the Winery lacked permits and safe drinking water.  Bishop Decl. ¶ 24. Plaintiffs cannot rely on this allegation to prove defamation under Count I because, even if it is proven to have been said, it was substantially true.

Finally, Plaintiffs' Count I suffers from the most fundamental problem of all:  lack of proof.  Plaintiffs have laced their Amended Complaint and interrogatory answers with descriptions of alleged defamatory statements made by Bishop that were supposedly overheard by others, not Plaintiffs.  *See, generally*, Exs. 14 and 15 to Counsel's Decl.  Thus, Plaintiffs have no personal knowledge about many of the statements they allege to be defamatory, and it remains entirely uncertain that Plaintiffs will ever assemble admissible evidence to substantiate them.  In the absence of competent evidence that can establish a dispute of material fact, Plaintiffs' allegations of defamation that are based on nothing more than hearsay must fail.

\* \* \* \* \*

Defendants are entitled to summary judgment on all dimensions of Plaintiffs' defamation claims at Count I.  Plaintiffs have failed to identify a single instance of a provably false statement uttered by Defendants that could conceivably give rise to liability, particularly when considered in the context of Plaintiffs' highly charged and public statements and conduct directed at the Board and Bishop.

## II.     THE TOWN IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' COUNT II ASSERTING VIOLATION OF RSA 91-A

By Count II of the Amended Complaint, Plaintiffs assert that the Town violated RSA 91-A, the "Right-to-Know" law. The bulk of Plaintiffs' 91-A claim relates to Brenda's requests to inspect and/or copy Town records pursuant to RSA 91-A:4.  Plaintiffs assert the Town "failed

to provide the information, or provided same late." Amended Compl. ¶ 262. In addition to complaints about the Town's responses to record requests, Plaintiffs also vaguely assert that the Town held "secret" meetings in violation of RSA 91-A:2. Plaintiffs request "all equitable and injunctive relief to which they may be entitled," yet do not make any particular request for relief. Plaintiffs further request "all damages allowed by law," even though RSA 91-A does not contain any provision for punitive or retrospective relief or compensation, such as an award of money damages. As Plaintiffs have failed to identify any present violation, or any other basis for injunctive relief, the Town is entitled to judgment as a matter of law.

### A.  The scope of rights and responsibilities under RSA 91-A is limited.

Chapter 91-A, <u>ACCESS TO GOVERNMENTAL RECORDS AND MEETINGS</u>, sets forth minimum standards that public bodies and agencies must follow with respect to the conduct of meetings and public access to records. *See, e.g.,* RSA 91-A:2.  In addition, RSA 91-A grants citizens certain rights, such as the right to record meetings, RSA 91-A:2, II, and the right to inspect and copy records in-person during regular business hours, RSA 91-A:4.

Many citizens and lawyers misunderstand the true scope of RSA 91-A. For example, RSA 91-A:4 grants citizens the right to inspect government records in the possession, custody, or control of "public bodies or agencies…during the regular or business hours…on the regular business premises of such public bodies or agencies." However, despite common belief, RSA 91-A does not grant citizens the *right* to request records via email, letter, or telephone. *See Taylor v. School Administrative Unit #55*, 170 N.H. 322, 328-329 (2017)("Insofar as the plaintiff complains that the SAU's procedure is needlessly inconvenient in that it requires him to appear in person at the SAU offices in order to obtain copies of the records on the thumb drive, we again agree with the trial court that such a procedure is entirely consistent with the text of RSA 91-A:4,

I[.]") In their Complaint Plaintiffs make a similar mistake, inaccurately asserting that "[p]ursuant to RSA 91-A:4, including but not limited to RSA 91-A:4, IV, Defendant Town must provide copies of covered documents within five days of the request, if they cannot be made immediately available." Amended Compl. ¶ 260. This, too, is a common misconception. RSA 91-A:4, IV simply requires a public body, *if the records are not immediately available*, to let a requesting party know within five days how long a response will take. *Reid v. New Hampshire Attorney General*, 169 N.H. 509, 516 (2016).

### B.  The scope of relief is limited.

While Chapter 91-A grants citizens certain rights, like the right to inspect records or record meetings, the relief available for alleged violations of RSA 91-A is limited and is primarily prospective in nature: "[t]he Right-to-Know Law, if violated, provides for three possible remedies: (1) an award of reasonable costs and attorney's fees, RSA 91-A:8, I; (2) an order voiding action taken by a public body or agency; RSA 91-A:8, II; and (3) an injunction, RSA 91-A:8, III." *ATV Watch v. New Hampshire Dept. of Resources and Economic Development*, 155 N.H. 434, 437 (2007).

Despite Plaintiffs' pleadings, RSA 91-A does not provide a mechanism for the award of damages for past violations of the statute.

### C.  The Town is entitled to judgment as a matter of law because the undisputed material facts demonstrate that Plaintiffs are not entitled to any relief.

Given the limited scope of relief under RSA 91-A, Plaintiffs' claims are best analyzed by determining what, if anything, exactly, they are seeking for relief and whether that relief is even available under the circumstances. If there is no relief available, the Town is necessarily entitled to judgment as a matter of law. To that end, Plaintiffs' RSA 91-A complaints fall into two general categories: document requests and the conduct of meetings, and each will be addressed

in turn in the context of a request for injunctive relief, invalidation, and, ultimately, an ward of attorney's fees and costs.

### 1. Plaintiffs are not entitled to any injunctive relief relating to their document requests.

The New Hampshire Supreme Court has indicated that the standard injunction elements or factors apply to injunctions requested pursuant to RSA 91-A: "[t]he issuance of injunctions, either temporary or permanent, has long been considered an extraordinary remedy. An injunction should not issue unless there is an immediate danger of irreparable harm to the party seeking injunctive relief, there is no adequate remedy at law and the party seeking an injunction is likely to succeed on the merits." *ATV Watch v. New Hampshire Dept. of Resources and Economic Development*, 155 N.H. 434, 437-438 (2007)(cleaned up). And although the *ATV Watch* Court resolved the appeal by "assuming, without deciding, that the traditional elements for granting an injunction are not required," the New Hampshire Supreme Court has since reiterated that even in RSA 91-A cases injunctive relief is an extraordinary remedy that should not issues unless there is an immediate danger of irreparable harm to the party seeking injunctive relief. *Hull v. Grafton County*, 160 N.H. 818, 827 (2010)(*citing ATV Watch v. N.H. Dep't of Resources & Econ. Dev.*, 155 N.H. 434, 437-38 (2007)). Here, the undisputed material facts demonstrate that the injunctive relief can never issue against the Town regarding the record requests, namely because Plaintiffs concede that the Town is *currently* complying with RSA 91-A.

In terms of the Plaintiffs' particular requests to inspect particular records, at her deposition Brenda effectively conceded that the Town fulfilled all her document requests, except for a single, solitary document she claims she "never received." Brenda Depo. at 85:15-86:1-10. The document in question was an exhibit to a settlement agreement between the Town and Defendant Bishop. *Id*. At the time of her request, the Town provided Mrs. Bishop the settlement

agreement but not the exhibit. This was because the Town was **not in possession of that document at the time**. The Town gave Mrs. Bishop everything it had, specifically informed her of where she could obtain the exhibits, and even made arrangements with the court clerk's office to have the records available.  Carpenter Decl. ¶¶ 16-19 and Ex. 1 thereto.  The right to inspect and copy records pursuant to RSA 91-A:4 applies only to records within the public entity's "possession, custody, or control," and does not extend to records the public entity does not actually have within *its* possession, custody, or control. RSA 91-A:4, I.

It is anticipated that Plaintiffs will argue that the Town was required to have the exhibit on file at the Town's offices pursuant to RSA 91-A:4. VI. That statute requires that that "[e]very agreement to settle a lawsuit against a governmental unit, threatened lawsuit, or other claim, entered into by any political subdivision or its insurer, shall be kept on file at the municipal clerk's office and made available for public inspection for a period of no less than 10 years from the date of settlement."

As a threshold matter, the plain language of the statute applies to settlement agreements, not exhibits or ancillary documents related to settlement agreements. Therefore, the Town's failure to maintain a copy of the exhibit at its clerk's office is not a violation of the statute. Even assuming *arguendo* the Town was required to keep a copy at its office, what relief are the Plaintiffs seeking? An order compelling the Town to obtain a copy from the Court to keep at the Town hall?

To the extent Plaintiffs vaguely allege that the Town fulfilled their requests "late," this, without more, is not actionable under RSA 91-A. While RSA 91-A permits citizens to inspect records that are immediately available, it imposes no bright line time limit by which a public entity must locate and produce records that are not immediately available, and therefore it is

impossible for a production to be actionably "late." As noted above, the "five day" time limit under RSA 91-A:4, IV(b) only requires the public entity to acknowledge that the request was made and provide an estimate of how long a response will take. At most, the statute contains an implied obligation to produce the records (or explain why they are not being produced) within a "reasonable" period of time. *See* RSA 91-A:4, IV(b)(3).

Plaintiffs' claim regarding "late" productions fails here for two reasons. First, Plaintiffs have failed to adduce *any* evidence regarding any particular delay with any particular record. Further, Plaintiffs have failed to adduce any evidence that the delay was unreasonable or unwarranted. *See ATV Watch v. N.H. Dept. of Transportation*, 161 N.H. 746, 757-758 (2011) (finding that petitioner's inadequately supported statement that documents were 'probably immediately available' was not sufficient to prove a violation of the Right-to-Know law).

Second, even assuming *arguendo* a technical violation of the statute occurred, Plaintiffs' requests and the Town's response occurred years ago. What relief are Plaintiffs seeking now? RSA 91-A does not provide for damages, so, at most, this Court could order the Town to more timely respond to requests? While perhaps there may be circumstances where such relief is appropriate, Plaintiffs have failed to produce any evidence to demonstrate that it is necessary here. To the contrary: Brenda testified that her concerns were related to prior administrations, and that the current leadership is doing things better. She testified that she has not had any problems or issues obtaining access to the Town records over the past several years. Brenda Depo. at 82:6-83:2. Brenda testified she has no reason to believe that the Town is not currently following the law with respect to Right to Know requests. Brenda Depo. at 93:16-23. It follows, therefore, that Plaintiffs can never meet their heavy burden of demonstrating entitlement to injunctive relief and the Town is entitled to judgment as a matter of law.

**2. The Plaintiffs are not entitled to any injunctive relief regarding the conduct of meetings, and are not actually seeking invalidation of any particular decision.**

Plaintiffs' Complaint and discovery is devoid of any specific complaint or evidence regarding the conduct of any particular meeting. However, the undisputed material facts demonstrate that Plaintiffs could never obtain injunctive relief against the Town regarding the conduct of meetings, much less invalidation of any particular decision.

As a threshold matter, Plaintiffs' concerns regarding the conduct of meetings appear to be premised on Brenda's own supposition and speculation, not admissible facts. During her deposition, it was clear that Brenda was concerned over decisions *made in public meeting* based on her personal belief that the members of the board did not sufficiently discuss the issues during those meetings. Brenda Depo at 89:4-14. In essence, Brenda *inferred* the occurrence of a so-called "secret" meetings based on her perceived lack of discussion.

Under RSA 91-A:8, II, "[t]he court may invalidate an action of a public body or agency taken at a meeting held in violation of the provisions of this chapter, **if the circumstances justify such invalidation**." (emphasis added). This relief is discretionary. *See, generally, Lambert v. Belknap County Convention*, 157 N.H. 375 (2008). However, even assuming *arguendo* that at some point the Town held – or failed to hold – a meeting in violation of RSA 91-A some years ago, the Plaintiffs have not identified any particular decision that they are asking this Court to invalidate pursuant to RSA 91-A:8, III, much less explained why invalidation would be appropriate. Indeed, when asked to do so, Brenda could not identify a single decision Plaintiffs are challenging. Instead, Brenda testified that she believed the Town "rectified decisions" she may have had an issue with. Brenda Depo. at 89:21-24. What relief then, are Plaintiffs seeking?

To the extent Plaintiffs are seeking an injunction against future violations, Plaintiffs cannot meet their heavy burden that an injunction is necessary *at this time*. Brenda testified that she has no current concerns regarding the conduct of Town Board of Selectmen meetings. *Id*. at 92:14-22. She has no concerns regarding so-called "secret" meetings or with the way the Town is noticing meetings.  *Id*. at 83:22-84:5.

### 3.  Plaintiffs are not entitled to an award of attorney's fees or costs.

An award of attorney's fees and costs is permitted only if "the court finds that such lawsuit was necessary in order to enforce compliance with the provisions of this chapter or to address a purposeful violation of this chapter" **and** "the court finds that the public body, public agency, or person knew or should have known that the conduct engaged in was in violation of this chapter." RSA 91-A:8, I. Costs alone may be awarded if the Court determines the lawsuit was necessary but does not find that the defendant knew or should have known the conduct violated RSA 91-A.

Here, it is telling that Plaintiffs waited years before filing their complaint regarding alleged RSA 91-A violations and only did so in the context of a "kitchen sink" complaint against the Town and a former selectman and political rival of Brett. Notably, Plaintiffs did not timely challenge any particular decision allegedly made in, or as the result of, an allegedly illegal or "secret" meeting. Plaintiffs did not timely challenge any alleged delay or denial of access to records. Instead, Plaintiffs complained in the press, in public meeting, and around town…effectively choosing to engage in political discourse over their concerns rather than litigation.

Plaintiffs did not file their complaint to *correct* any ongoing violation of RSA 91-A; Brenda's testimony, and the Complaint itself, reveal that all the alleged "violations" or wrongs

were corrected or moot by the time Plaintiffs filed their suit. It is clear that the Plaintiffs filed the Complaint with the mistaken assumption they could obtain damages and/or simply to make a point that they were "right" and the Town was "wrong." (In particular, Brenda testified that she perceived her RSA 91-A "damages" as a part of her defamation claims). However, RSA 91-A does not provide a mechanism for either form of relief. RSA 91-A is designed to ensure open government, and is focused on ensuring present compliance. RSA 91-A does not provide for an award of attorney's fees simply because a plaintiff proves that a public entity violated the statute in the past; it only allows an award if the lawsuit itself was *necessary* to ensure compliance.

Here, whatever "wrong" Plaintiffs suffered, it was "corrected" by the political process before Plaintiffs filed suit. Plaintiffs can never be entitled to an award of attorney's fees and the Town is entitled to judgment as a matter of law.

III. **DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' COUNT III ASSERTING VIOLATIONS UNDER 42 U.S.C. §§ 1983 AND 1988**

Plaintiffs assert at Count III that Defendants are liable under 42 U.S.C. §§ 1983 and 1988 for depriving them of their First Amendment rights. Plaintiffs assert that they suffered retribution at the hands of Defendants after they publicly criticized the Board and questioned the permitting of Bishop's Winery, submitted right-to-know requests to the Town and state agencies, and posted a yard sign critical of the Board's treatment of the police department. Amend. Compl. ¶ 270. Plaintiffs claim Defendants retaliated against this exercise of free speech by defaming Plaintiffs, invoking the Town's sign ordinance to force removal of the Plaintiffs' yard sign, closing the Town Hall temporarily, and refusing to appoint Brenda Currier as a Ballot Clerk for the 2018 elections. *Id*. ¶ 271.

Defendants are entitled to summary judgment on Count III because Plaintiffs lack evidence that the conduct alleged was retaliatory, that Defendants are responsible for the alleged

conduct, or that Plaintiffs suffered any concrete harm.

## A. Plaintiffs lack a causal link between Bishop and any alleged First Amendment retaliation.

To prevail on a First Amendment retaliation claim, Plaintiffs must establish that: "(1) [they] had a First Amendment right; (2) [Defendants] took an adverse action against [them]; (3) with the intent to retaliate against [them]; and (4) the retaliatory act caused the injury for which [they are] seeking compensation." *Reid v. Brodeur*, 2001 DNH 032 (Feb. 15, 2001) at 16-17 (citing *McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998)). When such claims arise from criticism of public officials by private citizens, courts will examine whether a defendant's alleged wrongful conduct was "motivated or substantially caused by the plaintiff's exercise of free speech." *Gill v. Pidlypchak*, 732 F.3d 157, 159 (2d Cir. 2004). As for the injury element, a plaintiff must show that the defendant's alleged retaliation chilled the plaintiff's free speech or caused some other concrete harm to the plaintiff. *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).

Plaintiffs' First Amendment claim against Bishop fails for lack of evidence. Plaintiffs cannot rely on Bishop's alleged defamation to substantiate their First Amendment claim because, as shown already, none of the statements attributed to Bishop are actionable. Plaintiffs are also incapable of showing that such alleged statements rose to the level of an "adverse action" under the color of law, or even that the statements caused a concrete harm to Plaintiffs separate from the alleged defamation injury.

Likewise, Plaintiffs have no evidence that Bishop was a causal link in the events that transpired over the spring 2018. Plaintiffs cannot show Bishop directed the Town's enforcement of the sign ordinance against Plaintiffs. *See* Carpenter Decl. ¶¶ 1-7. Plaintiffs also cannot show the temporary closure of the Town Hall was attributable to any independent action of Bishop or

that it was for a reason other than to address safety concerns raised by Town staff.  Bishop Decl.
¶¶ 34-35. What is more, Bishop had no role whatsoever in deciding who would serve as Ballot
Clerks for the March 2018 election.  *Id*. ¶ 36.

Without a causal link between Bishop and any alleged First Amendment retaliation,
Plaintiffs Count III fails against Bishop as a matter of law.

### B.  The Town is not vicariously liable to Plaintiffs under 42 U.S.C. § 1983.

"It is by now axiomatic that the doctrine of *respondeat superior* does not apply to claims
under section 1983."  *Gaudreault v Salem, Mass.*, 923 F.2d 203, 209 (1st Cir. 1990) (citing
*Voutour v. Vitale*, 761 F.2d 812, 819 (1st Cir. 1985)).  A municipality or its supervisory
personnel can be held liable for the constitutional misconduct of its employees only on the basis
of an "affirmative link" between their acts and those of the offending employee.  *Id*.  In order to
establish municipal liability, Plaintiffs must do more than merely establish the Town was
somehow negligent in the training or supervision of its agents.  *Id*. (citing *Canton v. Harris*, 489
U.S. 378, 387-90 (1989)).  Instead, Plaintiffs must show that the acts or omissions of the Town's
policymakers' evidence "deliberate indifference" to the rights of its inhabitants.  *Id*.

More particularly, Plaintiffs must establish that:

> (1) a municipal policymaker intentionally adopted a policy, implemented a
> training protocol, or allowed a custom to develop; (2) the challenged policy,
> training protocol, or custom caused a violation of federally protected rights; and
> (3) the policymaker acted with at least deliberate indifference to the strong
> likelihood that a violation of federally protected rights will result from the
> implementation of the policy, training, protocol, or custom.

*Penney v. Town of Middleton*, 888 F. Supp. 332, 340 (D.N.H. 1994); *accord Canton*, 489 U.S. at
385-92.  "[M]unicipal liability under § 1983 attaches where – and only where – a deliberate
choice to follow a course of action is made from among various alternatives by the official or
officials responsible for establishing final policy with respect to the subject matter in question."

*Pembaur v. City of Cincinnati,* 475 U.S. 469, 483 (1986).

This is true even if a plaintiff establishes that an official violated his rights. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985) (proof of a single incident of unconstitutional activity insufficient to impose liability on town without proof that it was caused by municipal policy). Equally important, "[w]ithout a finding of a constitutional violation on the part of a municipal employee, there cannot be a finding of section 1983 damages liability on the part of the municipality." *Wilson v. Town of Mendon*, 294 F.3d 1, 7 (1st Cir. 2002).

As an initial matter, because Plaintiffs cannot establish a claim of First Amendment retaliation against Bishop, their derivative claim against the Town under 42 U.S.C. § 1983 fails as a matter of law. *See City of Los Angeles v. Heller*, 475 U.S. 796 (1986) ("[N]either *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978), nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when, in fact, the jury has concluded that the officer inflicted no constitutional harm.")

Even if Plaintiffs could establish an underlying retaliatory action by Bishop or another Town agent, however, Plaintiffs would still need to prove an affirmative link to a policy or custom of the Town. Plaintiffs attempt to bridge this void by alleging that the Board fired two staff (Lines and Ogni) and harassed a third (Fogg) because of their supposed allegiance to Plaintiffs. Amend. Compl. ¶¶ 268A-C. Yet Plaintiffs cannot overcome the fact that Lines was released by the Board because he lacked liability insurance for his maintenance services and that Ogni was replaced as the Town's electrical contractor after Ogni elected not to submit a bid for the work. Bishop Decl. ¶ 10. As for Fogg, she left the Town of her own accord and settled her employment claims without an admission of wrongdoing by the Town. *Id.* ¶ 9. None of these

episodes, whether considered in isolation or in aggregate, evidence a policy or custom within the Town of exacting retribution for exercises of free speech.

The Town is entitled to summary judgment on Count III because Plaintiffs have no credible evidence that the Town maintained a policy or custom of retaliation when citizens exercised their right of free speech, let alone evidence that one of its agents retaliated against Plaintiffs for their free speech.

## IV.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S COUNT IV ASSERTING PARALLEL STATE CONSTITUTIONAL CLAIMS

New Hampshire does not have a statutory equivalent to §1983 under which a plaintiff may bring a claim for violation of state constitutional rights.  *Bourne v. Town of Madison*, 494 F. Supp.2d 80, 94 (D.N.H. 2007).  Therefore, where, as in this case, Plaintiffs bring a claim for violation of state constitutional rights at Count IV, they presumably ask the court to imply a civil remedy where none has yet been recognized.  *Id.*

Except in exceptional circumstances where no statutory, common law or administrative remedy is adequate, New Hampshire does not recognize a damages remedy modeled on tort law for state constitutional guarantees.  *See Bourne*, 494 F. Supp.2d at 94.  This is true for guarantees of equal protection or due process.  *Khater v. Sullivan*, 160 N.H. 372, 374-75 (2010); *Rockhouse Mt. Prop. Owners Ass'n. v. Town of Conway*, 127 N.H. 593, 598-99 (1986).  This is also true for the guaranty of free speech.  *Bleish v. Moriarity*, Civ. No. 11-cv-162-LM (D.N.H. Dec. 9, 2011) ("[T]he New Hampshire Supreme Court has never recognized any constitutional torts that would serve as causes of action to vindicate the rights protected by Part I, Articles 19, 22, and 32 of the New Hampshire Constitution.").

Having chosen the federal court as their forum, Plaintiffs cannot expect the court to break

new ground in recognizing rights under state law that have not yet been identified by the state's own court.  *DCPB, Inc. v. City of Lebanon*, 957 F.2d 913, 916 (1st Cir. 1992).  Since the New Hampshire Supreme Court has so far declined to recognize an implied right to damages for violations of Part 1, Article 22 of the New Hampshire Constitution, Defendants should be granted summary judgment on Plaintiffs' Count IV.

## CONCLUSION

Allegations that Town officials violated an individual's constitutional rights are serious and plaintiffs rightfully carry a heavy burden of proof.  Plaintiffs in this case cannot meet that burden and Defendants are entitled to summary judgment on all claims.

Respectfully submitted,

**THE TOWN OF GILMANTON**

By its attorneys

Dated:  December 20, 2021          By: /s/ Jonathan M. Shirley
                                         Brian J. S. Cullen (NH Bar No. 11265)
                                         Jonathan M. Shirley (NH Bar No. 16494)
                                         Cullen Collimore Shirley PLLC
                                         37 Technology Way, Suite 3W2
                                         Nashua, NH  03060
                                         (603) 881-5500
                                         bcullen@cullencollimore.com
                                         jshirley@cullencollmore.com

and

Demetrio F. Aspiras, Esquire (NH Bar No. 19518)
Drummond Woodsum
100 International Drive, Suite 340
Portsmouth, NH 03801-6891
(603) 433-3317
daspiras@dwmlaw.com

**MARSHALL E. BISHOP, INDIVIDUALLY AND D/B/A GILMANTON WINERY AND VINEYAR**

By his attorneys

Dated: December 20, 2021         By: /s/ Dona Feeney
Dona Feeney, Esquire (NH Bar No. 12854)
Friedman Feeney, PLLC
95 North State Street, Suite 5
Concord, NH 03301
(603) 736-7683
dfeeney@friedmanfeeney.com

## **CERTIFICATE OF SERVICE**

I certify that a copy of this filing was served via the Court's ECF filing system upon counsel of record.

Dated: December 20, 2021                    By: /s/ Jonathan M. Shirley
                                                 Jonathan M. Shirley