UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Brett A. Currier &
Brenda L. Currier

      v.

                                   Civil No. 18-cv-1204-LM
                                   Opinion No. 2022 DNH 098P

Town of Gilmanton &
Marshall E. Bishop

## **O R D E R**

Brett and Brenda Currier filed suit against the Town of Gilmanton and one of its Selectmen, Marshall E. Bishop.  The Curriers allege that defendants defamed them on numerous instances, violated New Hampshire's Right-to-Know law, and retaliated against them for exercising their constitutional rights to free speech under the First Amendment of the United States Constitution and Part I, Article 22 of the New Hampshire Constitution.  Defendants move for summary judgment on all claims.  Doc. no. 40.  The Curriers object.  For the following reasons, the court grants defendants' motion in part and denies it in part.

## **BACKGROUND**

Gilmanton is a rural town of fewer than 4,000 residents.  A three-person Board of Selectmen runs the town.  Each Selectman's term lasts three years, and elections are held in March.

Brenda and Brett Currier are longtime Gilmanton residents.  Brenda is a fifth-generation resident, and Brett has lived in Gilmanton since 1981.  Over the

years, both Brett and Brenda have been active in the community.  Brenda has worked as a secretary in the local police department, as a classroom aide and receptionist at Gilmanton School, as an EMT for the fire department, and as a ballot clerk.  Brett has served on the town's Budget Committee and as a volunteer firefighter.

I.     <u>Gilmanton Board of Selectmen 2012-2016</u>

In 2012, Brett was elected to a three-year term on the Board of Selectmen. He ran on a platform of keeping taxes low.  The following year, in 2013, Gilmanton's residents elected Don Guarino.  Brett supported Guarino's campaign because he agreed with Guarino's politics.  Together, Brett and Guarino formed a voting majority on the three-person Board.

After the 2013 election, the Board made several changes to town operations. The Board hired Guarino's sister-in-law, Stephanie Fogg, to fill a part-time administrative position.  The Board hired a new repairperson who had been recommended by Brett to work an hour or two per week.  The Board also changed the composition of the Gilmanton Planning Board, choosing not to reappoint its longtime chairperson.

In 2014, Steven McCormack was elected to the Board, joining Brett and Guarino.  Brett had not supported McCormack's candidacy, as McCormack was more liberal than Brett.

In 2015, Brett ran for reelection, but he lost to Michael Jean.  Thus, by the summer of 2015, the Board consisted of McCormack, Guarino, and Jean.  Among other actions, the Board elevated Stephanie Fogg's position to full-time with benefits.

## II.    The Leak

In the summer of 2015, the Gilmanton Chief of Police decided to retire.  Brett and Brenda's son was a police officer in Gilmanton, and they felt he should be next in line for the Chief's position.  Brett heard news of the impending retirement both from the Chief directly, and from his son.

The Chief informed the Board of his retirement in a nonpublic meeting. McCormack—a sitting Selectman—then came to the Curriers' camp where they were on vacation and told them about the Chief's retirement, even though the news of the retirement was not yet public.  McCormack further indicated that the job opening would be posted to the public.  Brett was upset, both because McCormack leaked this information to him, and because the job would be posted to the public instead of automatically going to his son.  Brenda, too, was upset, as she had not yet heard the news.  Brett felt that the news "ruin[ed] [their] weekend."  Doc. no. 40-13 at 12.

Brett and Brenda took action.  Brenda wrote multiple letters to a local newspaper, the Laconia Daily Sun, and emailed directly with one of its reporters. Brett demanded that McCormack resign.  When McCormack ultimately acquiesced,

Brett volunteered to take his seat.  The two remaining Board members, however, needed to agree on the appointment to fill McCormack's vacant seat.  Guarino supported Brett's appointment, but Jean (who had just defeated Brett in the most recent election) opposed it.  Thus, the Board appointed someone else to fill the temporary position for a year.  Nonetheless, the Curriers' son was appointed Chief of Police in November 2015.

III.   <u>The 2016 Election and its Aftermath</u>

Due to McCormack's resignation, there were two open Board seats in the 2016 election: the remaining one-year term of McCormack's seat, as well as the three-year seat held by Guarino.  Guarino ran for reelection for the three-year term, and Brett ran for the one-year seat.  Brett and Guarino supported each other in the campaign.

They both lost.  Brett lost to Marshall Bishop, a relative newcomer to the town who owned and operated the Gilmanton Winery and Vineyard.  Guarino lost to long-time resident Steve McWhinnie.   Thus, after the election Bishop, McWhinnie, and Jean sat on the Board.

The new Board revisited some of the personnel matters decided by the previous administrations.  Previously Stephanie Fogg had taken minutes in Board meetings, but the Board decided to have Heather Carpenter take minutes instead. In addition, the new Board voted to return Fogg's position to part time.  Rather than work part time, Fogg went on leave and ultimately resigned.  (Fogg later sued

Gilmanton, asserting that she had been retaliated against for whistleblowing; the case settled with no admission of fault.)  Finally, the Board terminated the repairperson who had been hired during Brett's tenure because the repairperson did not carry liability insurance.

The Curriers, Guarino, and Guarino's wife were angry at the personnel changes.  They began appearing at Board meetings to question the new Board's agenda and at times made lengthy statements.[1]

The personnel dispute spilled over into the press.  On June 10, Brenda sent a Laconia Daily Sun reporter audio of a Board meeting she had recorded.  On June 13 the Daily Sun published a letter to the editor from Brett, entitled "Our selectmen are inexperienced & it's leading to many missteps."  Doc. no. 40-15.  Brett prefaced the letter by stating that contrary to the assertions of various letter writers and comments in the paper, he was not upset about losing the 2016 election.  Instead, he asserted that he was concerned about the personnel issues, arguing that various people—including Fogg—had lost their jobs because "they dared to speak up" and that the new Selectmen had "calculated vendettas against targeted people."  Id. at 2.

---

[1] Defendants, citing a declaration by Bishop, assert that the Curriers often dominated the meetings, arguing, for example, that on one occasion Brenda read aloud a four-page letter, including some 32 different questions she posed to various Board members or the Town Administrator.  The Curriers acknowledge that they did at times attend public meetings, but contend that they merely "ask[ed] reasonable questions" and "ma[de] observations in accord with their [First Amendment] rights."  Doc. no. 42-1 ¶ G.3.  They assert that they did not "dominate" the meetings.  Id.

On June 30, Brenda emailed the reporter what Brenda described as "a very brief summary of the goings on of the Selectmen and their illegal meetings regarding employees." Doc. no. 40-9 at 1. In the email, Brenda claimed that Fogg had been fired because of her relationship to the Guarinos. She also claimed that the Board had instituted various other personnel changes because of a "political vendetta." Id. Finally, Brenda claimed that the Board had been holding illegal meetings—that is, private meetings that had not been publicly posted. Brenda asked the reporter to keep Brenda's name out of the article.

IV.   The Winery

In early May 2016, Brett visited Bishop at Bishop's winery. Brett wanted to talk to Bishop because he was concerned about the change to Fogg's position, and he also had a concern about Carpenter's meeting minutes. Brett advised Bishop "to be careful because he [was] not invincible in that position" and told him "not to get hung up and out to dry . . . and get sued by Mrs. Fogg." Doc. no. 40-3 at 17. Brett pointed out that Bishop had "a lot to lose." Id. Brett says that the visit was "cordial." Id. Bishop, however, perceived the visit as a direct threat to his family's home and his livelihood.

Also that month, Brenda approached Bishop during a break in a public meeting and asked him to remove a sign advertising the winery from a property that she owned and where her mother lived. She asserted that her family wanted the sign removed because they were unhappy with the Board's treatment of Fogg.

After Bishop moved the sign to an adjacent property, Brenda challenged whether Bishop had the proper permits to display it.

The dispute over permits for Bishop's sign led Brenda to question whether Bishop had the proper permits for his restaurant.  In June, Brenda made various Right-to-Know requests for documents related to the winery's permitting.  Brenda then asked the Planning Board to research whether Bishop had the proper permits.

The Curriers also called into question the winery's septic system.  Brett contacted the New Hampshire Department of Environmental Services to challenge the permitted use of the winery's septic system.  Brenda wrote a letter to the Board in July stating that the septic system could not support the 40-seat restaurant and asserting that the winery was "potentially creating a health risk" that "could put the Town of Gilmanton in legal jeopardy if no action is taken."  Doc. no. 40-20 at 1.

Against this backdrop, in late June, Gilmanton Town Administrator Paul Branscombe wrote to the County Attorney asking for review of the situation. Branscombe wrote: "We need the County Attorney to review a situation here in Town where a Selectman is being Harassed by a Resident . . . the wife of the chap who lost in the running last March."  Doc. no. 40-3.

After the County Attorney declined to intervene, Bishop wrote to the New Hampshire Attorney General.  Bishop wrote that since the election, Brett and Brenda had "threatened [him] and [his] livelihood."  Doc. no. 40-4.  Bishop also outlined the Right-to-Know requests the Curriers had made, and asserted the

Curriers were utilizing the law for harassment.  Bishop asked the Attorney General if there was anything he could do to end the alleged threats and harassment.

Bishop also wrote a letter to the Department of Environmental Services explaining the winery's operation and capacity.  Bishop then published a version of his letter as an open letter in the Daily Sun, entitled "Mr. Currier is not doing this over a concern for the environment."  Doc. no. 40-6.  Bishop asserted that since the 2016 election, Brett and Brenda "have tried in every way to disrupt the Board of Selectmen meetings and constantly [used] the 'Right to Know' law for other than the reason it was intended."  Id. at 2.

In July, Brenda attended a Board meeting and asked the Board to issue a cease-and-desist order to close the winery.  She also submitted a Right-to-Know request for town communications with any state agency regarding the winery.

In early August, the Daily Sun published an article reporting that Jean had been ousted as the head of the Board.  The article said that Gilmanton's other two Selectmen had voted to oust Jean and had installed Steve McWhinnie as the new chairman.  It noted that "[a]ccording to Jean, the ongoing complaints made by Brett and Brenda Currier about the way the selectmen handle themselves and their accusations against Selectmen Marshall Bishop and the Gilmanton Winery [were] behind the recent push."  Doc. no. 42-14 at 2.  Further, the article stated that "Jean said [Bishop], who made the motion to oust him, was tired of being 'beat up' in public by the Curriers, but Jean said he thinks getting tossed around a little bit is part of being a selectman and a publicly elected official."  Id. at 3.

8

On August 12, Brenda contacted the New Hampshire Liquor Commission, stating that she believed the information Gilmanton gave the commission about the winery permitting was incorrect.  That same day, she contacted the Planning Board's chairperson to ask about the winery's permits.

Around that time, a friend of the Curriers, Al Blake, wrote a series of letters critical of the winery that were published in the Daily Sun.  On August 15, Bishop responded with a letter, also published in the Daily Sun, entitled, "I have all the permits needed to operate our winery & restaurant."  Doc. no. 42-6.  Bishop began the letter stating that although he generally believed "tit for tat" letters like this were not productive, he felt he needed "to set the record straight from [his] perspective and then the taxpayers and residents of the Town of Gilmanton can make their own judgments."  Id.  He wrote that since the 2016 election, "the incoming [B]oard has been inundated by constant remarks and threats against us by a small group of people, primarily from former selectmen Currier, Don [Guarino] and their wives, along with commentaries from Al Blake."  Id.  He admitted that the new Board had made mistakes during its learning curve, but wrote that he "never expected former selectmen's wives calling us 'despicable,' liars, thieves and everything in-between at a town meeting."  Id.

In late August, Brenda wrote a letter to the Daily Sun to correct what she viewed as inaccuracies in an earlier Daily Sun article about the winery dispute. Brenda discussed the Planning Board and the permitting process, and then wrote

"I'm sure the public is just as sick of reading my letters as I am sick of writing them."  Doc. no. 40-25.

Also in late August, a town resident named Carolyn Baldwin published a letter entitled "Restore decorum in Gilmanton" in the Concord Monitor.  Doc. no. 42-7.  She wrote that "defeated candidates for selectmen have engaged in concentrated efforts to undermine the work of sitting selectmen" and that "one sore loser and his spouse have engaged in open threats to selectman Marshall Bishop."  Id.

Ultimately, the Planning Board issued a cease-and-desist order that would have closed the winery over Thanksgiving.  Bishop then sued the town and obtained an injunction to prevent the closure.  On November 30, the Daily Sun published an article quoting Bishop's claim that the Curriers were taking out "their own personal grudges on him and his business." Doc. no. 42-8 at 2.  Bishop's suit against the town ultimately settled.


V.      "Support the Police" Signs

In the March 2017 election, Guarino challenged Bishop for his Board seat.  Gilmanton's residents reelected Bishop for a full three-year term.  In December of that year, the Board (still Jean, McWhinnie, and Bishop), directed the Chief of Police (the Curriers' son) to provide the Board information on hiring and schedules and proposed a budget that would move funds from the police department to legal expenses.

In response to the proposed cut to the police budget, the Curriers erected a sign on their property proclaiming, "Support the Police even if the Selectmen Don't." Other residents in town posted similar signs.  At the time, a town zoning ordinance required permits for certain signs, and further provided that "[o]nly signs advertising a business or industry in the Town of Gilmanton shall be permitted." Doc. no. 40-27.

In January 2018, Heather Carpenter (who was then the Assistant Town Administrator) received a complaint from a resident about the signs, but the resident was reluctant to file a formal complaint.  Carpenter states that the resident told her "he did not want to incur the wrath of one of the residents," which Carpenter interpreted as referring to Brenda.  Doc. no. 40-34.  Carpenter states that she therefore submitted the complaint in her own name because she was a resident and a complaint could only move forward if it was signed.

In early February, Brenda came to Town Hall to request a copy of the signed complaint.  Carpenter met with Brenda and gave her a copy.  Carpenter told Brenda that she "did not want to see [her] name slandered on Facebook."  Doc. no. 40-34 at 2.  Brenda then filed a formal complaint to the town about Carpenter, claiming that Carpenter had used "threatening words and tone of voice" during the interaction.  Id.  Carpenter later submitted a second complaint to the Code Enforcement Department about the signs.  Id.

On February 14, Bill Tobin, the Town's Code Enforcement Officer, sent letters to several people with the "Support the Police" signs, including the Curriers

and the Guarinos, stating that the signs violated the town zoning ordinance.  Doc.

no. 40-10.  The letters asserted that state law defined a political sign as one which

"expressly or implicitly advocates the success or defeat of any party, measure or

person at any election" and that the Support the Police signs did not appear to fall

into this definition.  Id.  The letters stated that the signs had to be removed by

February 22, or the recipients would be fined $275/day.

The Curriers contacted the ACLU for help.  The ACLU sent a letter to the

town asserting that the Code Enforcement Officer's letters violated state and

federal law and requested that they be retracted immediately.  The ACLU's letter

asserted that the signs were political, and that Gilmanton's ordinance banning

individuals from placing political signs on their property violated the First

Amendment.  The ACLU also noted that the town appeared to have only sent letters

to individuals with the anti-Board signs, and not to individuals with signs

expressing other political views.  The ACLU argued that such viewpoint

discrimination was patently unconstitutional.  Finally, the ACLU stated that the

town appeared to misunderstand the state law concerning political advertising,

noting that it did not apply to signs erected by a private person on their private

property.

In early March, the town acquiesced.  The Curriers received a letter from

Selectman McWhinnie stating that the Board had voted to retract the sign removal

order.  The Curriers had not been fined, though they had removed the sign for one

night to add wording to attempt to make it conform to what the original letter had said about political signs.

VI.    Closure of Town Hall

Throughout the sign dispute, Brenda continued to file Right-to-Know requests, including two on February 21 and 22, 2018.  Brenda and Carpenter spoke on February 21 when Brenda went to Town Hall to obtain the second sign complaint.  Brenda and Carpenter each described their interaction differently. Carpenter asserted that she "told Brenda again that [she] did not want to have [her] name slandered on Facebook."  Doc. no. 40-34 ¶ 6.  Brenda asserted that Carpenter had "acted in a hostile and threatening manner."  Id. at ¶ 9.

Two days later, Carpenter complained to the Board that she felt unsafe working at Town Hall.  She stated that there were no physical barriers to separate staff from the public, and "with the growing controversy about the police signs, [the employees] began to feel like things could easily boil over into physical violence against [them]."  Doc. no. 40-34 at 2.  In her declaration, Carpenter states that she believed a small group of residents—led by Brenda—were making Town Hall unsafe.  She states that this group of residents was "visiting Town Hall multiple times a day on a rotating basis" to request public records, and that the "frequency and amount of requests convinced [her] that the requests were not being made for any genuine purpose, but rather to interrupt and interfere with the ability of staff to get work done."  Id. at 2-3.

13

The Board held an emergency meeting that day and decided to close Town Hall for the remainder of the day.  That evening, the Board conducted another emergency meeting and decided to renovate the building to add a physical barrier between staff and members of the public.  In the meantime, the Board decided to keep the front door of Town Hall locked and require visitors to use the back entrance and buzzer system to access the building.  The town posted a scrolling banner on its website stating that the front entrance of Town Hall was closed due to "safety concerns."

Brenda acknowledged that the website banner did not name her specifically, but states in her deposition that Bishop mentioned her by name at the emergency meeting and people then repeated what he had said.

In early March, the Board issued a press release about the closure of Town Hall entitled "Setting the Record Straight to Move Forward."  Doc. no. 40-29.  In it, the Board stated that on February 23, Town Hall employees "received an overwhelming number of requests for information" and that "[t]he volume of these requests essentially prevented these employees from performing their regular duties."  Id.  In addition to the volume of requests, the Board asserted that "the conduct of some of the individuals who came to the Town office to make requests, created an environment in which Town employees did not feel that they could effectively perform their duties."  Id.

VII.   <u>Ballot Clerk</u>

In the past, Brenda had frequently served as a town Ballot Clerk in local and national elections.  As the March 2018 election rolled around, Brenda responded to a request for ballot clerks stating she was available for the whole day.  The town did not appear to respond.  Brenda then wrote to confirm her hours for election day, and the town responded that it already had enough volunteers and did not need her help.  Brenda returned as a ballot clerk the following year, in 2019.

VIII.   <u>Damages</u>

As a result of defendants' conduct, Brenda claims that she has suffered from stress and a lack of sleep, which have caused her to increase her prescription Xanax dosage.  Brenda also states that she stopped going to Town Hall and Board meetings because of defendants' conduct, and thus her First Amendment rights were chilled.  Both Brett and Brenda concede that the alleged harm to their reputations has not impacted their ability to work or find jobs.

IX.   <u>Claims</u>

The Curriers bring the following legal claims:

- Count I:  Defamation

- Count II:  Violation of New Hampshire's Right to Know Law, RSA 91-A

- Count III:  First Amendment retaliation, 42 U.S.C. § 1983

- Count IV:  Retaliation under the New Hampshire Constitution's right to freedom of speech, N.H. Const. Pt. 1, Art. 22

They seek numerous types of relief, including compensatory damages, punitive damages, attorney fees, and various injunctions.

## LEGAL STANDARD

The court must grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing the record, the court construes all facts and reasonable inferences in the light most favorable to the nonmoving party. Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 115 (1st Cir. 2013). "When the motion is premised upon the absence of any genuine issue of material fact, the burden shifts to the nonmovant to identify, by means of materials of evidentiary quality, an issue of fact that is 'more than merely colorable.'" Faiella v. Fed. Nat'l Mortg. Assoc., 928 F.3d 141, 145 (1st Cir. 2019).

## DISCUSSION

Defendants move for summary judgment on all the Curriers' claims. As to Count I—defamation—defendants assert various legal arguments, including that some of the Curriers' allegations are not supported by evidence in the record, that various immunity doctrines protect defendants, and that the Curriers are limited-purpose public figures. The court agrees with defendants, and grants summary judgment for defendants on every instance of alleged defamation. As to Count II— violation of New Hampshire's Right-to-Know law—defendants argue that the

Curriers are not entitled to any of the permissible statutory remedies. The court again agrees, and grants summary judgment on Count II. For Count III—First Amendment retaliation under § 1983—defendants argue that Bishop is not responsible for any of the alleged instances of retaliation, and that Gilmanton cannot be held vicariously liable for the actions of its employees. On this count, the court grants summary judgment in part and denies it in part, finding that a genuine issue of material fact exists as to whether some of the alleged instances of retaliation can be properly attributed to Gilmanton under Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986). Finally, as to the free speech claim premised on the New Hampshire Constitution—Count IV—the court dismisses it without prejudice because this court is not the proper forum for a plaintiff to seek to expand the scope of remedies available for alleged violations of state constitutional rights.

## I. <u>Defamation</u>

Under New Hampshire law, a plaintiff proves defamation by showing that defendants failed to exercise reasonable care in publishing, without a valid privilege, a false and defamatory statement of fact about the plaintiff to a third party. Pierson v. Hubbard, 147 N.H. 760, 763 (2002). Publication means communication of the statement to a third party. Duchesnaye v. Munro Enters., Inc., 125 N.H. 244, 253 (1984). A statement is defamatory if it "tends to lower plaintiff in the esteem of any substantial and respectable group of people." Moss v. Camp Pemigewassett, Inc., 312 F.3d 503, 507 (1st Cir. 2002) (quoting Nash v. Keene Publ'g Corp., 127 N.H. 214, 219 (1985)).

17

Though the elements of defamation are defined by state law, the United States Supreme Court has read the First Amendment to impose additional limitations in defamation cases. Gray v. St. Martin's Press, Inc., 221 F.3d 243, 248 (1st Cir. 2000). Two of those limitations are discussed below: nonactionable statements of opinion, and limited purpose public figures.

The Curriers allege 42 instances of defamation: 26 separate instances in their amended complaint, doc. no. 21 ¶¶ 244-46, and another 16 instances in their answers to interrogatories, doc. no. 40-32 at 3-5. Some of the additional 16, however, just repeat instances alleged in the complaint. The court grants summary judgment for defendants as to every alleged instance of defamation. The court outlines the various issues plaguing the alleged instances of defamation, noting that many of them fail for multiple reasons.

### A.   Many of the alleged instances of defamation suffer from lack of proof.

As a threshold matter, defendants argue that there is no evidence in the record that would permit a reasonable jury to conclude that many of the instances of defamation occurred.

As noted above, when a motion for summary judgment is "premised upon the absence of any genuine issue of material fact, the burden shifts to the nonmovant to identify, by means of materials of evidentiary quality, an issue of fact that is 'more than merely colorable.'" Faiella, 928 F.3d at 145; see also Fed. R. Civ. P. 56(c). "In seeking to forestall the entry of summary judgment, a nonmovant may

not rely upon allegations in its pleadings." Lucia v. Prospect St. High Income Portfolio, Inc., 36 F.3d 170, 174-75 (1st Cir. 1994).

Many of the instances of defamation alleged in the complaint are not supported by any evidence in the record. Moreover, these instances supposedly occurred during conversations at which the Curriers themselves were not present, and thus even had the Curriers attested to these allegations in their depositions or declarations, they would be hearsay that the court could not consider in deciding summary judgment. See Hannon v. Beard, 645 F.3d 45, 49 (1st Cir. 2011) ("It is black-letter law that hearsay evidence cannot be considered on summary judgment for the truth of the matter asserted.").

For example, the Curriers allege that during the summer of 2016, someone identified only as "DW" overheard Bishop say "ya, the Curriers are causing me problems. The Curriers are used to being in power and now they are losing their power since I beat Brett by 77 votes." Doc. no. 21 ¶ 244(C). Similarly, the Curriers allege that on February 27, 2018, Bishop had a conversation at a local restaurant where he stated, among other things, that "Heather [Carpenter] feels threatened by Mrs. Currier because she was talking over her and in her personal space." Id. at ¶ 244(N). In their complaint, the Curriers claim to have heard about this statement from someone named "Mrs. Smithers," but they offer no affidavit from "Mrs. Smithers" attesting to hearing it. Likewise, the Curriers allege that at Gilmanton Old Home Day, Bishop told someone referred to only as "RM" that the Curriers were to blame for "all of it." Id. at ¶ 244(P). Yet again the Curriers do not cite to

any affidavit from RM or any other listener with personal knowledge of Bishop making this statement.  The Curriers have not cited any evidence that any of these alleged statements by Bishop ever took place.

The court thus grants summary judgment in defendants' favor as to all the following alleged instances of defamation because they not supported by admissible evidence: doc. no. 21 ¶ 244(A); ¶ 244(C); ¶ 244(F); ¶ 244(G); ¶ 244(L); ¶ 244(N); ¶ 244(O); ¶ 244(P); ¶ 244(Q); ¶ 244(R); ¶255(S); ¶ 244(V); ¶ 244(X)[2]; 244(Z); doc. no. 40-32 7(A)(1), 7(A)(2), 7(A)(4), 7(A)(5), 7(A)(6), 7(A)(9), 7(D).

B.     The claims against the Town of Gilmanton are barred by RSA 507-B.

Next, defendants contend that that the Curriers' defamation claims against the Town of Gilmanton are barred by RSA 507-B.  "Various concepts of immunity exist under both common law and statutory law to protect governmental entities and public officials from liability for injury allegedly caused by official conduct." Everitt v. Gen. Elec. Co., 156 N.H. 202, 209 (2007).  As relevant here, RSA 507-B:5 provides: "No governmental unit shall be held liable in any action to recover for bodily injury, personal injury or property damage except as provided by this chapter

---

[2] The allegation in ¶ 244(X) incorporates statements Bishop allegedly made to persons named only as "LO" and "RO" for which there is no admissible evidence.  It also, however, incorporates ¶¶ 234-235 of the Amended Complaint, which describe statements Bishop made to Ralph Lavin at a restaurant in Loudon for which there is evidence (an affidavit by Lavin).  Those statements to Lavin at the restaurant are also contained in ¶ 244(Y).  For the purpose of clarity, the court refers to the "LO" and "RO" statements here as ¶ 244(X), but separately refers to the Lavin statements as ¶ 244(Y) below.

or as is provided or may be provided by other statute."  The statute defines
"personal injury" to include "libel, slander, or the publication or utterance of other
defamatory or disparaging material."  RSA 507-B:1.  The New Hampshire Supreme
Court has construed RSA 507-B:5 as providing immunity for municipal employees
only where the official "acted within the scope of his official duties and
. . . 'reasonably believe[d], at the time of the acts or omissions complained of, that
his conduct was lawful.'"  Farrelly v. City of Concord, 168 N.H. 430, 448 (2015)
(quoting RSA 541-B:19, I(d)).

   The Curriers allege that Gilmanton is vicariously liable for various
statements by town employees related to the February 2018 closure of Town Hall.
The undisputed record reveals that, when Town Hall was closed, there was a sign
on the door stating, "Due to Increased Safety Concerns for our Employees, Please
Buzz in for Assistance."  Doc. no. 42-28.  Similarly, a banner on the front page of the
town website read: "DUE TO SAFETY CONCERNS, FRONT ENTRANCE OF THE
ACADEMY BUILDING IS CLOSED."  Doc. no. 42-26.  In the following weeks, the
town issued a press release entitled "Setting the Record Straight to Move Forward,"
explaining the closure of Town Hall.  Doc. no. 40-29.  Gilmanton's press release
stated that on February 23, Town Hall employees "received an overwhelming
number of requests for information" that "essentially prevented these employees
from performing their regular duties."  Id.  It explained that the "volume of these
requests, together with the conduct of some of the individuals who came to the
Town office to make requests, created an environment in which Town employees did

not feel that they could effectively perform their duties."  Id.  An article in the Union Leader later quoted the press release.  Doc. no. 42-27.

The Curriers allege all these statements are defamatory.  Yet they point to no evidence suggesting that the various employees did not reasonably believe that their conduct was lawful.  See Farrelly, 168 N.H. at 448; Huckins v. McSweeney, 166 N.H. 176, 182 (2014).  Even construing the facts and reasonable inferences in the light most favorable to the Curriers, the court finds that Gilmanton is entitled to immunity under RSA 507-B:5.  Accordingly, the court grants defendants' motion for summary judgment on the following alleged instances of defamation: Doc. no. 21 ¶ 244(T); ¶ 244(U); ¶ 244(W); doc. no. 40-32 ¶ 7(C).


C.      The claims against Bishop in his official capacity are barred by RSA 507-B:4, IV.

Next, defendants argue that the claims against Bishop in his official capacity are also barred by statutory immunity.  Similar to immunity for local government entities, New Hampshire law also grants immunity to government employees acting in their official capacities.  Specifically, the version of RSA 507-B:4, IV in effect during the relevant time period granted immunity for a present or former municipal employee "so long as said employee or official was acting within the scope of his office and in good faith."  RSA 507-B:4, IV (2008) (amended May 29, 2018).  As Judge DiClerico pointed out, the "statute does not define 'good faith,' and the New Hampshire Supreme Court has not addressed the meaning of 'good faith' for purposes of RSA 507–B:4, IV, in a published decision."  Holm v. Town of Derry, No.

22

11–cv–32–JD, 2011 WL 6371792, at *3 (D.N.H. Dec. 20, 2011). "In the face of

similar silence regarding the definition of the term 'good faith' in New Hampshire's

Whistleblowers' Protection Act, . . . the New Hampshire Supreme Court explained"

that it gives "a statutory term that is not defined its plain and ordinary meaning."

Crosby v. Strafford County Dept. of Corrs., No. 12-cv-383-LM, 2015 WL 3484912, at

*6 (D.N.H. June 2, 2015). This court previously concluded, therefore, that "if asked

to do so in the context of RSA 507–B:4, IV, the New Hampshire Supreme Court

would define 'good faith' as 'honesty in belief or purpose' and 'faithfulness to one's

duty or obligation.'" Id. (citing Black's Law Dictionary 808 (10th ed. 2014)). Thus,

to avoid summary judgment on the statements that Bishop made in his official

capacity, the Curriers must produce evidence that he failed to act in conformity

with the standard of conduct described above.

The statements the Curriers complain about relevant to RSA 507-B:4, IV are

undisputed. They fall into two general categories: Bishop's statements describing

the Curriers' conduct at board meetings, and his statements relating to the Town

Hall closure. In the first category, for example, the Curriers assert that in an

August 4, 2016 Laconia Daily Sun article, Bishop was quoted as saying that

Brenda's comments at town meetings got "out of hand." Doc. no. 21 ¶ 71. In

another Laconia Daily Sun article—this one dated August 15, 2016—Bishop was

quoted as saying that the "incoming board has been inundated by constant remarks

and threats against us by a small group of people, primarily from former selectmen

Currier, Don Guarino and their wives, along with commentaries from Al Blake."

Doc. no. 40-7 at 1.  Further, he stated that he "never expected former selectmen's wives calling us 'despicable,' liars, thieves and everything in-between at a town meeting."  Id.

As to the second category—statements about the Town Hall closure—the Curriers allege that Bishop would "answer when asked if there had been a threat, by referring the person to the ["Setting the Record Straight to Move Forward" press release], still implying there were employee safety issues, after repeatedly publicly referencing Mrs. Currier as the cause."  Doc. no. 21 ¶ 198.

Bishop is entitled to immunity if he was acting (1) within the scope of his office, and (2) in good faith.  All of the relevant statements regarded town business—i.e., Board meetings and the status of Town Hall.  The Curriers neither argued nor produced any evidence that Bishop was acting outside the scope of his office when he was describing official town business.  Thus, Bishop is protected by governmental immunity so long as his statements were made in good faith.

The court finds that there are no material facts in dispute on the question of whether Bishop's statements about the Currier's conduct at board meetings and the closure of Town Hall were made with "honesty in belief or purpose" and with "faithfulness" to Bishop's duty as a Selectman.  See Crosby, 2015 WL 3484912, at *6.  Based on the undisputed evidence in the record, the court finds that Bishop acted honestly when describing that Board meetings got "out of hand" and stating that he did not expect to be called a liar or a thief at a town meeting.   Notably, the Curriers concede that Brenda did make a statement calling the selectmen

24

"'despicable,' liars thieves and everything in-between"—which she asserts was her opinion about the selectmen and their job performance.  Doc. no. 21 ¶ 81.  The only contested part of the statement, then, is whether Bishop "never expected" Brenda to make that statement.  The court finds that Bishop's statement was made with honesty in belief or purpose.  See Crosby, 2015 WL 3484912, at *6.  Similarly, the court finds that Bishop's statements about the closure of Town Hall—which indicated that Brenda was the reason for it—were made in good faith.  Bishop referred questioners to the town's official press release, and stated that there had been employee safety issues.  Heather Carpenter's declaration makes clear that she did feel unsafe at Town Hall.  See doc. no. 40-34 ¶ 10.  Thus, there is no dispute of fact that Bishop's statements on these issues were made in good faith.  The court grants defendants' motion for summary judgment on the following alleged instances of defamation: doc no. 21 ¶ 244(F), (H), (V), (Y); doc. no. 40-32 ¶ 7(A)(3).

> D.    The Curriers are limited purpose public figures with respect to the winery dispute and they have not shown actual malice.
>
> > i.   Public figure status

Next, defendants contend that the Curriers are limited purpose public figures with respect to the winery dispute, and therefore must prove that defendants acted with actual malice by clear and convincing evidence.

"Under the taxonomy developed by the Supreme Court, private plaintiffs can succeed in defamation actions on a state-set standard of proof (typically,

negligence), whereas the Constitution imposes a higher hurdle for public figures and requires them to prove actual malice." Pendleton v. City of Haverhill, 156 F.3d 57, 66 (1st Cir. 1998). "Actual malice" requires a showing that the statement was made with "knowledge that it was false or with reckless disregard of whether it was false or not." Lluberes v. Uncommon Prods., LLC, 663 F.3d 6, 12 (1st Cir. 2011) (quoting N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279 (1964)). Private individuals, in contrast, enjoy a more lenient standard because they have "relinquished no part of [their] interest in the protection of [their] good name," and thus are "more deserving of recovery." Thomas v. Tel. Publ'g Co., 155 N.H. 314, 341 (2007) (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 345 (1974)).

The U.S. Supreme Court "has created two subclassifications of public figures: (1) persons who are public figures for all purposes; and (2) so-called limited-purpose public figures who are public figures for particular public controversies." Thomas, 155 N.H. at 340 (citing Gertz, 418 U.S. at 351). "As to the second group, individuals may become limited-purpose public figures when they 'have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.'" Id. at 341 (quoting Gertz, 418 U.S. at 345). "Courts make the limited-purpose public figure determination 'by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation.'" Id. (quoting Gertz, 418 U.S. at 352). Determining whether an individual is a public or private figure is a question of law. Id.

The first step of the limited purpose public figure analysis is to isolate the public controversy.  Lassonde v. Stanton, 157 N.H. 582, 590 (2008).  "Identification of the implicated public controversy is not a mere formality because the scope of the controversy in which the plaintiff involves himself defines the bounds of his public presence."  Id. (citations omitted).  "A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way."  Id. (quoting Waldbaum v. Fairchild Publ'ns, Inc., 627 F.2d 1287, 1296 (D.C. Cir. 1980), cert. denied, 449 U.S. 898 (1980)).  "The [United States] Supreme Court has made clear that essentially private concerns or disagreements do not become public controversies simply because they attract attention.  Rather, a public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants."  Id. (quoting Waldbaum, 627 F.2d at 1296).

Here, the relevant public controversy is the dispute over the winery's permits.  The undisputed facts show this was a "public controversy" because the status of the winery's permits and compliance with safety standards affected anyone who visited the winery.  See Lassonde, 157 N.H. at 590 (a public controversy must "affect the general public or some segment of it in an appreciable way").  Indeed, according to Brett himself, the winery posed an urgent public health risk and a liability risk for the town.

27

Moreover, the undisputed facts show that the Curriers "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved," Thomas, 155 N.H. at 341, by speaking at multiple town meetings, emailing a local reporter, and writing letters to the Board trying to spur action with respect to the winery.  Specifically, Brett wrote to the Board that the winery was "potentially creating a health risk" that "could put the Town of Gilmanton in legal jeopardy if no action is taken."  Doc. no. 40-20 at 1.  He argued that the winery did not have the proper septic system for the size of the restaurant. He sent copies of his letter to multiple town entities (the Town Administrator, the Planning Board, the Zoning Board, the Conservation Commission), and, notably, to the Laconia Daily Sun.  Meanwhile, Brenda spoke at Board meetings and submitted multiple records requests related to the winery's permitting.  See doc. no. 40-18; 40-19.  The Curriers thrust themselves to the forefront both because they tried to influence the resolution of the issues involved (by researching the permitting issues and writing to multiple town entities), and because they invited media attention by sending the letter to the local newspaper.

The Curriers argue that Brenda only wrote to the reporter "a few times." Doc. no. 42-1 at 8.  Yet courts have found that even isolated contact with media is sufficient to confer limited purpose public figure status.  See, e.g., Pendleton, 156 F.3d at 69 (single interview for profile article); Bourne v. Arruda, No. 10–cv–393–LM, 2013 WL 93637, at *2 (D.N.H. Jan. 8, 2013) (single letter in local newspaper).

In short, the court finds no genuine issue of material fact regarding the Curriers'
"limited purpose public figure" status with respect to the winery dispute.

Finally, the Curriers assert that they were "just ask[ing] questions as
citizens," and exercising their First Amendment rights.  Doc. no. 42-1 at 24.   But
Bishop has First Amendment rights, too.  Accordingly, to prove a claim against
defendants, the Curriers must show the defendants acted with "actual malice."
N.Y. Times Co., 376 U.S. at 279.

    ii.  <u>Actual malice</u>

As noted above, "actual malice" requires a showing that the statement was
made with "knowledge that it was false or with reckless disregard of whether it was
false or not."  Lluberes, 663 F.3d at 12 (quoting N.Y. Times Co., 376 U.S. at 279).
The court finds that none of the Curriers' winery-related allegations rises to this
level.  Specifically, the undisputed facts show that the following statements, among
others, were neither false nor made with reckless disregard of falsity:

- Bishop's July 11, 2016 letter to the New Hampshire Department
  of Environmental Services regarding the winery dispute that
  stated, among other things, that the Curriers "tried in every way
  to disrupt the Board of Selectmen meetings and constantly using
  the 'right to know law' for other than the reason it was intended."
  Doc. no. 40-5.

- Bishop's statement in that same letter that "I believe Mr. Currier
  is not doing this because of his concern for the environment."  Id.

- Bishop's August 15, 2016 letter to the Laconia Daily Sun that
  stated, among other things, that "the incoming board has been
  inundated by constant remarks and threats against us by a small
  group of people, primarily, from former selectmen Currier, Don

Guarino and their wives, along with commentaries from Al Blake." Doc. no. 40-7.

- Bishop's statement in that same letter that "I never expected former selectmen's wives calling us 'despicable', liars, thieves, and everything in-between at a town meeting." Id.

- Bishop's statement in a November 30, 2016 Laconia Daily Sun article that that after the 2016 election, "[Brett and his wife took out their personal grudges on [Bishop] and his business." Doc. no. 42-8.

- Bishop's statement in a December 1, 2017 Laconia Daily Sun article that after the 2016 election "Brett and Brenda Currier began attacking the winery as 'operating illegally' and complained to the Planning Board that it was operating as a restaurant without a special exception from the Zoning Board of Adjustment." Doc. no. 42-10 at 2.

- Bishop's statement in a Laconia Daily Sun article regarding the winery dispute stating that the Curriers had a vendetta against him.

As discussed below, these statements are also plagued by other problems such as being nonactionable statements of opinion, but the lack of actual malice alone merits granting summary judgment for defendants. Accordingly, because the undisputed record lacks evidence of actual malice, the court grants defendants' motion with respect to the following alleged instances of defamation: Doc. no. 21 ¶¶ 244(D); 244(H); 244(I); 244(J); 244(K); 244(L); 244(M); doc. no. 40-32 ¶ 7(A)(7), (A)(10), (A)(11).

E.   <u>Many of the alleged instances of defamation are nonactionable
     statements of opinion.</u>

Another of defendants' arguments is that various of the alleged instances of

defamation are nonactionable statements of opinion.  One of the limitations the U.S.

Supreme Court imposes on defamation law is that statements of opinion cannot give

rise to a defamation claim.  Gray, 221 F.3d at 248.  "[O]nly statements that present

or imply the existence of facts that can be proven true or false are actionable under

state defamation law."  Id.  Merely prefacing a statement with "I think" is not

enough to turn a fact into an opinion where what is supposedly "thought" is, or

implies, a proposition of fact.  Id.  "Rather, the cases are likely to protect a

statement as "opinion" where it involves expressions of personal judgment,

especially as the judgments become more vague and subjective in character."  Id.

"Put together, the relevant question is not whether challenged language may be

described as an opinion, but whether it reasonably would be understood to declare

or imply provable assertions of fact."  Piccone v. Bartels, 785 F.3d 766, 771 (1st Cir.

2015) (internal quotations and citations omitted).  "Whether a statement is a

verifiable fact or an opinion can be decided by the court as a matter of law."  Id.

"This task requires an examination of the totality of the circumstances in which the

specific challenged statements were made, including the general tenor and context

of the conversation and any cautionary terms used by the person publishing the

statement."  Id.

Many of the allegedly defamatory statements are non-actionable statements

of opinion.  For example, in a letter to the Laconia Daily Sun, Bishop wrote: "I never

31

expected former selectmen's wives calling us 'despicable', liars, thieves, and everything in-between at a town meeting."  Doc. no. 42-6 at 1.  The Curriers admit that Brenda, who is a former selectman's wife, called Bishop and the other selectmen despicable, liars, and thieves.  Doc. no. 21 ¶ 81.  The fact that Bishop "never expected" that to happen is a statement of opinion because it is Bishop's subjective mental belief and personal judgment.  The same is true for Bishop's alleged statements to a visitor at Town Hall that "the Curriers are causing me problems," and that "[t]he Curriers are used to being in power and now they are losing their power since [I] beat Brett by 77 votes."[3]  Doc. no. 21 ¶¶ 54; 244(C).  Finally, Bishop's statement that "I believe Mr. Currier is not doing this because of a concern for the environment" in his letter to the Department of Environmental Services is also a statement of opinion.  Though prefacing the statement with "I believe" is alone not enough to render the statement an opinion, Bishop's speculation about Brett's motivations—something vague and subjective in character—would not be "reasonably understood to declare or imply provable assertions of fact."  Piccone, 785 F.3d at 771.

Accordingly, the court grants summary judgment for defendants with respect to the undisputed statements of opinion contained within doc. no. 21 ¶¶ 244(A); 244(C); 244(D); 244(H); 244(N); 244(O).

_____

[3] The Curriers acknowledge that Brett was defeated by 77 votes, and thus that portion of the statement was true.  Doc. no. 21 ¶ 61.

F.   <u>Absolute privilege protects defendants' statements to prosecuting
     authorities.</u>

Defendants also argue that their undisputed statements to prosecuting

authorities are protected by absolute privilege.  Similar to immunity doctrines,

certain types of absolute privilege can bar an injured party from recovering any

compensation.  McGranahan v. Dahar, 119 N.H. 758, 762 (1979).  One such type of

absolute immunity is for statements made during judicial proceedings.  Id. at 763.

This is one of the oldest absolute common-law privileges.  2 Law of Defamation § 8:5

(2d ed.).  "[T]he general rule is that statements made in the course of judicial

proceedings are absolutely privileged from civil actions, provided they are pertinent

to the subject of the proceeding."  McGranahan, 119 N.H. at 762.  "The requirement

of pertinence eliminates protection for statements made needlessly and wholly in

bad faith."  Id.  "The rule reflects a determination that the potential harm to an

individual is far outweighed by the need to encourage participants in litigation,

parties, attorneys, and witnesses, to speak freely in the course of judicial

proceedings."  Id.

This privilege extends only to statements made in the course of judicial

proceedings.  Id.  This includes statements made "preliminary to a proposed judicial

proceeding"—i.e., complaints to prosecutors.  2 Law of Defamation § 8:17 (2d ed.).

Statements made to the press, however, are not related to the proceeding and are

not covered by absolute privilege.  Id.  Protecting statements to the press would not

serve the purpose of the privilege, which is to "serve the judicial system itself" by

"encouraging the pursuit of truth by freeing participants of the fear that what they

say in a proceeding may render them subject to liability in a defamation or other tort suit." Id. Thus, "[e]ven an absolute privilege does not permit an individual to categorically republish possibly defamatory statements without consequence." Id.

Absolute privilege protects defendants' undisputed statements directly to prosecuting authorities. This includes Branscombe's email to the Belknap County Attorney, doc. no. 21 ¶ 244(B)[4]; Bishop's and Branscombe's complaints to the New Hampshire Attorney General's Office, id. ¶ 244(E); and Bishop's conversation with the New Hampshire Attorney General's Chief Investigator, id. ¶ 244(G).

The Curriers allege that Branscombe or Bishop additionally emailed their letters to others outside of prosecuting offices. Yet the Curriers present no evidence that either Bishop or Branscombe actually circulated their letters to others. The email from Branscombe to the County Attorney's office does not show anyone was copied on the email. The letter from Bishop to the Attorney General states that only Branscombe was copied on it. In his deposition, Bishop was asked if he sent his letter to the Attorney General to anyone else in the community, and he answered that he did not remember doing so. He did acknowledge that it had been sent to others but he stated, "I don't know what happened, none of us do." Doc. no. 42-15. Thus, the record contains no evidence that any town employee circulated the

---

[4] The Curriers argue that this statement is not protected because defendants published it not to the County Attorney himself, but rather to someone in another office in Belknap County, Debra Shackett. This argument lacks merit. Though Shackett's precise role is unclear, the record shows she was an intermediary to reach the County Attorney—she responded by relaying the County Attorney's response. Publishing the statement to Shackett was nonetheless a statement "preliminary to a proposed judicial proceeding." 2 Law of Defamation § 8:17 (2d ed.).

letters more broadly.  See Hannon, 645 F.3d at 49 ("A genuine issue of material fact can be created only by materials of evidentiary quality.").  The court therefore grants Defendants' motion for summary judgment with respect to the defamation claims based on doc. no. 21 ¶¶ 244(B), (E); doc. no. 40-32 ¶ 7(A)(8), (B).

 

G.     <u>Bishop is not responsible for statements made by others.</u>

Defendants also note that some of the Curriers' allegations are based on the premise that Bishop would be somehow responsible for statements made by others. Specifically, the Curriers argue that the letter to the Concord Monitor editor entitled "Restore decorum in Gilmanton" written by Carolyn Baldwin contains misinformation that they think came from Bishop.  The Curriers offer no evidence, however, that that the content of the letter came from Bishop.  Similarly, the Curriers allege that "a member of the community" posted on the Town of Gilmanton's Facebook page that Brenda threatened to take away Bishop's livelihood.  Doc. no. 21 ¶ 82.  Yet the only connection the Curriers offer between this statement and Defendants is that the statement was "attributable to Bishop as it came from one of his employees, and he is responsible for republication of all of his slanderous statements."  <u>Id.</u>  Even setting aside the lack of evidence supporting this allegation, the mere fact that the unnamed Facebook commentator was one of Bishop's employees is not sufficient to raise a reasonable inference that Bishop was the original source of the statement.  Thus, the court grants summary judgment for

Defendants with respect to the defamation claims related to the statements in id. ¶¶ 244(I) and 244(Q) because there is no evidence they came from Bishop.

In sum, having reviewed each identified instance of defamation, found that no genuine disputes of material fact exist, and determined that Defendants are entitled to judgment as a matter of law, the court grants summary judgment for Defendants as to Count I.

## II.   **Right-to-Know law**

In Count II, the Curriers assert that Gilmanton violated RSA 91-A, New Hampshire's Right-to-Know law.  The facts relevant to the alleged violations are undisputed.  Defendants move for summary judgment, arguing that the Curriers are not entitled to any of the permissible remedies outlined in the statute.  The court agrees.

"The purpose of the Right-to-Know Law is to ensure both the greatest possible public access to the actions, discussions and records of all public bodies, and their accountability to the people."  Taylor v. Sch. Admin. Unit #55, 170 N.H. 322, 326 (2017).  Although the statute does not provide for unrestricted access to public records, New Hampshire courts construe it with "a view to providing the utmost information in order to best effectuate [the] statutory and constitutional objectives."  Id.

"The Right-to-Know Law, if violated, provides for three possible remedies: (1) an award of reasonable costs and attorney's fees, RSA 91–A:8, I; (2) an order voiding action taken by a public body or agency, RSA 91–A:8, II; and (3) an injunction, RSA

91–A:8, III."  ATV Watch v. N.H. Dep't of Res. & Econ. Dev., 155 N.H. 434, 437 (2007).  Attorney fees and costs are available "provided that the court finds that such lawsuit was necessary in order to enforce compliance with the provisions of this chapter or to address a purposeful violation of this chapter."  RSA 91-A:8, I.  In addition, attorney fees—but not costs—require a finding that the agency "knew or should have known" that the conduct violated the law.  Id.; ATV Watch, 155 N.H. at 439.

The Curriers' arguments boil down to two categories: (1) inadequate responses to record requests, and (2) conduct of meetings.  The court discusses each in turn.

A.     Record requests

RSA 91-A:4 lays out citizens' rights to inspect governmental records.  It states that "during the regular or business hours" and "on the regular business premises" of all public bodies and agencies, citizens have the right to inspect all governmental records "in the possession, custody, or control of such public bodies or agencies."  RSA 91-A:4.  Upon a request for a governmental record reasonably described, a public body or agency must "make available for inspection and copying any such governmental record within its files when such records are immediately available for such release."  RSA 91-A:4, IV.  If a public body or agency is unable to make the record available immediately, within five business days it must (1) make the record available, (2) deny the request, or (3) "[p]rovide a written statement of

the time reasonably necessary to determine whether the request shall be granted or denied and the reason for the delay."  RSA 91-A:4, IV(b).

The Curriers detail various instances where Gilmanton allegedly either failed to provide information in response to Brenda's Right-to-Know requests or provided it late.  At her deposition, Brenda testified that she did not receive responses to some of her requests because the requested documents did not exist.  As for the documents that did exist, Brenda stated that she did eventually receive many of them, but received them late.  Brenda could think of only one document that existed but that she had not received—an attachment to the settlement agreement between Bishop and Gilmanton.

The Curriers claim "all damages as allowed by law" including reasonable attorney fees and costs.  Doc. no. 21 ¶ 263.  They also claim "all equitable and injunctive relief to which they may be entitled."  Id.

The court analyzes the Curriers' claim from the perspective of what relief they seek.  First, the Curriers concede that they are not seeking an injunction because Gilmanton is no longer violating RSA 91-A.  As for the single document Brenda never received (the attachment to the settlement agreement), the Curriers are not seeking an injunction ordering that it be released because Brenda retrieved it from the court.

The second statutory remedy—voiding an action taken at a public meeting— is clearly not applicable to records requests.  Thus, the only statutory remedy potentially available to the Curriers is attorney fees.

But as noted above, attorney fees and costs are available only where "the court finds that such lawsuit was necessary in order to enforce compliance with the provisions of this chapter or to address a purposeful violation of this chapter." RSA 91-A:8, I. Even construing reasonable inferences in the Curriers' favor, evidence in the record does not support a finding that this lawsuit was necessary to enforce compliance with the Right-to-Know law. In their objection to Defendants' motion for summary judgment, the Curriers argue only that "[i]t is perhaps due to this action, and also in part due to a change in Selectmen, that the violations appear to be no longer occurring." Doc. no. 42-1 at 35. Stating that the lawsuit "perhaps" spurred Gilmanton to comply with the law—without citation to any evidence in the record—does not support a reasonable inference that the lawsuit was "necessary in order to enforce compliance" with RSA 91-A. RSA 91-A:8, I. Thus, the Curriers are not entitled to attorney fees on this basis. In sum, the Curriers are not entitled to any of the forms of relief outlined in RSA 91-A:8.

B.    Conduct of meetings

The Curriers' complaints related to the conduct of meetings fares no better. As a threshold matter, the Curriers argue they are entitled to "declaratory relief as to the conduct of meetings" and argue that certain past meetings "should be found to be illegally held." Doc. no. 42-1 at 34. Yet, as stated above, RSA 91-A provides only for specific remedies, and declaratory relief is not among of them.

As to the conduct of meetings, the Curriers seek neither an injunction nor an order voiding an action taken at any purportedly improper meetings.  See doc. no. 42 at 34.  As with the records requests claim, then, the record does not support a finding that this lawsuit was necessary to enforce compliance with the Right-to-Know law with respect to the conduct of meetings.  The Curriers are therefore not entitled to attorney fees on this basis.  Because the relevant facts are undisputed and the Curriers are not entitled to any form of relief, the court grants summary judgment for Defendants on Count II.

III.   **Section 1983**

In Count III, the Curriers bring a claim for First Amendment retaliation against Bishop and Gilmanton pursuant to 42 U.S.C. § 1983.  To state a claim for relief under § 1983, a plaintiff must satisfy two elements: first, that the defendant acted under the color of state law; and second, that his conduct deprived plaintiffs of rights secured by the Constitution or by federal law.  See Gagliardi v. Sullivan, 513 F.3d 301, 306 (1st Cir. 2008) (citing Rodríguez-Cirilo v. García, 115 F.3d 50, 52 (1st Cir. 1997)).

Defendants do not contest that they were acting under color of state law.  The court therefore assumes this element is met, and moves on to the second element— whether defendants' conduct deprived plaintiffs of constitutional rights.

The Curriers argue that defendants deprived them of their First Amendment rights by retaliating against them after they exercised their right to freedom of

speech.  To prevail on a First Amendment retaliation claim, a "plaintiff must first prove that (1) he or she engaged in constitutionally protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action." D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 43 (1st Cir. 2012).  With regard to the second element, "an adverse action is an action that would deter a reasonably hardy person from exercising his or her constitutional rights."  Id. at 43 n.11.

The Curriers engaged in constitutionally protected conduct—i.e., in numerous instances, the Curriers voiced their dissatisfaction with town government and related issues.  There is no dispute that the Curriers' speech in general was protected by the First Amendment.  The question, then, is whether the Curriers suffered any "adverse action" resulting from their protected speech.

In their complaint, the Curriers cite 19 instances in which they were allegedly retaliated against for exercising their First Amendment rights.  Doc. no. 21 ¶ 271(A)-(S).  Specifically, they allege that they were (1) defamed in numerous instances, (2) Brenda was not allowed to speak at a Board meeting, (3) Brenda was mistreated by an employee at Town Hall, (4) a town employee threatened Brenda, (5) Gilmanton sent the Curriers cease-and-desist letters to take down their Support the Police signs, and (6) Gilmanton attempted to exclude Brenda from being a ballot clerk.[5]  The Curriers argue that as a result of these acts, their First Amendment

---

[5] The Curriers also allege various instances where Gilmanton supposedly infringed on the constitutional rights of others, doc. no. 21 ¶ 268(A)-(D), 271(E), yet

rights were chilled. For example, they state that absent the Defendants' conduct, Brenda would have continued to go to Town Hall more frequently and would have continued to be involved in town government. The court examines each alleged adverse action in turn.

A. Defamation as Retaliation

First, many of the adverse actions the Curriers allege are speech acts by defendants. In essence, the Curriers attempt to restate their defamation claims as First Amendment claims. For example, the Curriers again complain about the "Setting the Record Straight to Move Forward" press release, the sign on Town Hall stating it was closed due to "Safety Concerns" (which they argue implicates them), and numerous comments published in the Laconia Daily Sun.

"[C]ourts are not typically receptive to retaliation claims arising out of government speech." Najas Realty, LLC v. Seekonk Water Dist., 821 F.3d 134, 143 (1st Cir. 2016); see also Mulligan v. Nichols, 835 F.3d 983, 989 (9th Cir. 2016) ("Retaliation claims involving government speech warrant a cautious approach by courts."). This is because government officials themselves retain First Amendment rights and because "[r]estricting the ability of government decisionmakers to engage in speech risks interfering with their ability to effectively perform their duties."

---

they have not shown any reason they would have standing to enforce the rights of others. See Penney v. Town of Middleton, 888 F. Supp. 332, 338 (D.N.H. 1994) ("[A] § 1983 claim cannot be predicated on a violation of another person's protected rights.").

Mulligan, 835 F.3d at 989.  Courts recognize that one of the overarching purposes of the First Amendment—promoting a marketplace of ideas—would hardly be promoted if public officials were "prevented from responding to speech of citizens with speech of their own." Id.  Thus, courts impose a higher bar for stating a First Amendment retaliation claim based on government speech.  See, e.g., Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 687 (4th Cir. 2000) ("[W]here a public official's alleged retaliation is in the nature of speech, in the absence of a threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow, such speech does not adversely affect a citizen's First Amendment rights, even if defamatory.").

For example, in Najas Realty, the First Circuit focused on the importance of government speech when affirming the dismissal of a First Amendment claim premised on retaliatory defamation by a government actor.  821 F.3d at 143.  There, the plaintiff alleged that various statements by the state water district's superintendent regarding the environmental impact of a proposed development project were defamatory.  Id. at 142-43.  The court reasoned that these allegations did not state a claim for retaliation violating the First Amendment because "[n]ot only do public officials have free speech rights, but they also have an obligation to speak out about matters of public concern."  Id. at 143 (citation omitted).

Similarly, in Goldstein v. Galvin, the First Circuit cited authority reasoning that "'mere accusations' of wrongdoing and 'mere criticisms' [by a government official] d[o] not amount to adverse employment action for retaliation purposes."

719 F.3d 16, 30 (1st Cir. 2013). There, the plaintiff complained about the use of his name in a public announcement of an enforcement proceeding on the Secretary of the Commonwealth of Massachusetts's website. Id. The court dismissed the claim, noting that "[a]llowing a plaintiff to weave a First Amendment retaliation claim out of something so mundane as a government official's issuance of a true statement, not couched in inflammatory terms, about a matter of public concern would trivialize the Constitution." Id. at 31.

Here, similarly, the undisputed facts show that the alleged defamatory statements do not rise to the level of adverse action for the purposes of § 1983. For example, the Curriers argue that the sign on Town Hall stating that the front entrance was closed due to "safety concerns" constituted retaliation under the First Amendment. Similarly, the Curriers take issue with the "Setting the Record Straight to Move Forward" press release. The press release explained the reason for the closure of Town Hall, including the "overwhelming" number of Right-to-Know requests that "essentially prevented [town] employees from performing their regular duties." Doc. no. 40-29. These statements—as well as the numerous others about which the Curriers complain that are premised on government speech[6]—did not include threats, coercion, or intimidation. See Suarez Corp., 202 F.3d at 687. They were about matters of public concern, and not couched in inflammatory terms. Goldstein, 719 F.3d at 30. Moreover, given that the Curriers themselves spoke with the press on numerous occasions about their various grievances with the Selectmen,

---

[6] Specifically, doc. no. 21 ¶ 271(A), (B), (C), (D), (F), (L), (N), (O), (R), (S).

it did not rise to the level of a constitutional violation for the Selectmen to respond to those allegations publicly.  As noted, the "marketplace of ideas is undermined if public officials are prevented from responding to speech of citizens with speech of their own."  Mulligan, 835 F.3d at 989.  Thus, none of the alleged instances of retaliation based only on government speech rises to the level of adverse action under the First Amendment.

B. Remaining Claims

The remaining claims allege violations only by Gilmanton, not by Bishop, as there is no evidence that Bishop had any role in the relevant conduct.  Assessing liability against a town "requires two basic elements: first, that plaintiff's harm was caused by a constitutional violation, and second, that the [town] be responsible for that violation, an element which has its own components."  Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 25-26 (1st Cir. 2005).  With respect to the remaining claims, defendants make no argument regarding the first element— whether they comprised a constitutional violation.  Instead, they argue only that Gilmanton is not responsible for any potential violation.  Absent any briefing on the first element, the court assumes—for the purposes of this order—that it is met and proceeds to the second.

A municipality may not be held vicariously liable under § 1983 on account of its employees' unlawful conduct.  Connick v. Thompson, 563 U.S. 51, 60-61 (2011).  Rather, municipalities are held responsible under § 1983 only for their own illegal

acts.  Id.  To succeed on a § 1983 claim against a municipality, the plaintiff must show that "action pursuant to official municipal policy" caused the plaintiff's injury.  Id.  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  Id. at 61.  This principle ensures that municipalities will only be held liable for "action[s] taken with the requisite degree of culpability" where there is a "direct causal link between the municipal action and the deprivation of federal rights."  Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 404 (1997).

In cases where a plaintiff claims that a particular municipal action itself violates federal law—i.e., an act by a municipality's legislative body or authorized decision-maker—issues of fault and causation are relatively straightforward.  Id. at 404-05; see Pembaur, 475 U.S. at 480 ("No one has ever doubted, for instance, that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body—whether or not that body had taken similar action in the past or intended to do so in the future—because even a single decision by such a body unquestionably constitutes an act of official government policy.").  This principle applies to acts both by the municipality's legislative body as well as certain other government officials.  Pembaur, 475 U.S. at 480.  Where the allegations are based on decisions of high-ranking government officials, municipal liability "attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials

responsible for establishing final policy with respect to the subject matter in question." Id. at 483 (decision by county prosecutor, acting as county's final decisionmaker, could be properly attributed to municipality).

On the other hand, "[w]here a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." Bryan Cnty., 520 U.S. at 405. In limited circumstances, "a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." Connick, 563 U.S. at 61. But a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Id. "To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" Id. (citing Canton, 489 U.S. at 388). "Only then 'can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983.'" Id. (citing Canton, 489 U.S. at 389).

Turning to the facts of the case, the Curriers' remaining allegations of retaliation are that Carpenter and Brenda had a conversation at Town Hall that did not go well, doc. no. 21 ¶ 271(H); Carpenter told Brenda not to post something on Facebook, id. ¶ 271(I), (J); Gilmanton attempted to exclude Brenda from being a ballot clerk, id. ¶ 271(Q); Brenda was not allowed to speak at a Selectmen's

meeting, id. ¶ 271(G); Gilmanton prevented the public from accessing Town Hall, id. ¶ 271(M); and Gilmanton sent the Curriers cease-and-desist letters to take down their Support the Police signs, id. ¶ 271(K).

As to the first two allegations—pertaining to Carpenter and Brenda's conversation at Town Hall—there is no evidence that these acts were pursuant to official municipal policy.  They did not fall into the type of policy outlined in Pembaur—that is, "a deliberate choice to follow a course of action" made "by the official or officials responsible for establishing final policy with respect to the subject matter in question."  Pembaur, 475 U.S. at 483.  Moreover, the Curriers also lack evidence that the conduct evinces any failure to train by Gilmanton—i.e., the type of policy outlined in Canton.  See Canton, 489 U.S. at 392 (failure-to-train claims "can only yield liability against a municipality where that city's failure to train reflects deliberate indifference to the constitutional rights of its inhabitants").  For example, construing reasonable inferences in the Curriers' favor, the record shows neither that town employees "so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need," id. at 390 n.10, nor that "policymakers were aware of, and acquiesced in, a pattern of constitutional violations," id. at 397 (O'Connor, J., concurring in part and dissenting in part).  The claimed violations were isolated instances, not a pattern of constitutional violations.

The Curriers make no substantive argument to the contrary.  In their briefing opposing summary judgment, they cursorily state only that the conduct

they complain about "meets the standard set forth in . . . <u>Canton</u>," doc. no. 42 at 36, but offer neither reasoning nor citation to evidence in the record in support. Because the defendants did not engage in the alleged "mistreat[ment]" and "threat[s]," doc. no. 21 ¶ 271(H),(I), pursuant to any official policy, the Curriers cannot hold Gilmanton liable under § 1983 for this conduct.

As to the cease-and-desist letter, in contrast, a reasonable jury could find it was based on official policy because it stemmed from an act by an "official[] responsible for establishing final policy with respect to the subject matter in question." Pembaur, 475 U.S. at 483. Specifically, Gilmanton sent the Curriers a cease-and-desist letter to take down their Support the Police signs. The cease-and-desist letter was sent by Bill Tobin, the town's Building Inspector/Code Enforcement Officer. Doc. no. 42-23. The content of the letter shows that Tobin "possesse[d] final authority to establish municipal policy with respect to the action ordered." Pembaur, 475 U.S. at 481. Moreover, Tobin's letter evinced a "a deliberate choice to follow a course of action . . . from among various alternatives," <u>id.</u> at 483, given that it attempted to enforce a town ordinance to threaten the Curriers with a fine if they did not take down their "Support the Police" sign. <u>See</u> doc. no. 42-23. Like the prosecutor in <u>Pembaur</u>, Tobin "made a considered decision based on his understanding of the law" and acted to enforce that understanding. 475 U.S. at 484. Indeed, Tobin's cease-and-desist letter is one of those cases where "a plaintiff claims that a particular municipal action <u>itself</u> violates federal law" and thus "resolving . . . issues of fault and causation is straightforward." Bryan Cnty.,

49

520 U.S. at 404.  Because a jury could find that Tobin's letter directing the Curriers to take down their sign could be properly attributed to Gilmanton, Gilmanton has not shown it is entitled to judgment as a matter of law.

Finally, there is a genuine issue of material fact as to whether Gilmanton's alleged attempt to exclude Brenda from being a ballot clerk, disallowing Brenda from speaking at a town meeting, and closure of Town Hall similarly stem from an act by an "official[] responsible for establishing final policy with respect to the subject matter in question." Pembaur, 475 U.S. at 483.  In their motion for summary judgment, defendants make no argument as to why these alleged instances of retaliation do not fall under the type of policy outlined in Pembaur. Further, defendants do not argue that these acts fail to not meet the elements of First Amendment retaliation, see D.B., 675 F.3d at 43, nor do they put forward any other legal basis for dismissal.

As such, the Curriers may proceed with their claim that Gilmanton retaliated against them by (1) issuing the cease-and-desist letter, doc. no. 21 ¶ 271(K), (P); (2) disallowing Brenda from speaking at a town meeting, id. ¶ 271(G); (3) attempting to exclude Brenda from being a ballot clerk; id. ¶ 271(Q); and (4) closing Town Hall, id. at ¶ 271(M).  All the other alleged instances of retaliation fail for the reasons outlined above.

IV.   **New Hampshire Constitution**

Finally, the Curriers assert a state constitutional claim that is parallel to their First Amendment retaliation claim.  "State constitutional provisions, however, unlike their federal counterparts, are not generally enforceable through a claim for damages, and this court is not the proper forum for a plaintiff to seek to expand the scope of remedies available for alleged violations of state constitutional rights."  Ali v. N. N.H. Corr. Facility, Warden, No. 12-CV-364-SM, 2013 WL 3367098, at *4 (D.N.H. July 3, 2013).  As this court noted in Bleish v. Moriarty, the New Hampshire Supreme Court has not addressed whether there is a cause of action under state law to vindicate the right protected by Part I, Article 22 of the New Hampshire Constitution—the provision protecting freedom of speech.  No. 11-CV-162-LM, 2011 WL 6141271, at *2 (D.N.H. Dec. 9, 2011).  As in that case, this court is not the proper forum to determine whether the New Hampshire Supreme Court would decline to recognize such a claim, as it has for other constitutional torts.  See, e.g., Khater v. Sullivan, 160 N.H. 372, 374-75 (2010) (declining to recognize a constitutional tort for violations of the Equal Protection Clause of the New Hampshire constitution).  Thus, Count IV is dismissed without prejudice.

**CONCLUSION**

In sum, the court grants summary judgment for defendants on Counts I and II.  The court grants summary judgment for defendants in part and denies it in part on Count III.  Only the claim in Count III that Gilmanton retaliated against the Curriers by (1) issuing the cease-and-desist letter, doc. no. 21 ¶ 271(K); (2)

disallowing Brenda from speaking at a town meeting, id. ¶ 271(G); (3) attempting to exclude Brenda from being a ballot clerk, id. ¶ 271(Q); and (4) closing Town Hall, id. at ¶ 271(M), may proceed.  The court dismisses Count IV without prejudice to the Curriers' ability to refile in state court.

SO ORDERED.

_____
Landya B. McCafferty
United States District Judge

August 15, 2022

cc: Counsel of Record